Edward **TUBBS, State Superintendent of Banking, State of Iowa, Receiver, Appellant,**

v.

**UNITED CENTRAL BANK, N.A., DES MOINES, Iowa n/k/a First Interstate Bank of Des Moines, N.A., Appellee.**

No. 87–1691.

Supreme Court of Iowa.

Jan. 24, 1990.

As Corrected Jan. 25 and Jan. 29, 1990.

Mark E. Schantz and Richard A. Malm of Dickinson, Throckmorton, Parker, Mannheimer & Raife, P.C., Des Moines, for appellant.

Ross H. Sidney and Patrick J. McNulty of Grefe & Sidney, Des Moines, for appellee.

Considered by LARSON, P.J., and SCHULTZ, CARTER, LAVORATO and ANDREASEN, JJ.

LARSON, Justice.

The Exchange Bank of Bloomfield, Iowa, was closed in 1983 by the Iowa Superintendent of Banking, upon his determination that the bank was insolvent. The superintendent, acting as receiver for the bank's depositors, sued the United Central Bank, N.A. (UCB), now known as First Interstate Bank of Des Moines, N.A.: (1) for damages for conspiring with and aiding and abetting the Exchange Bank principals in causing the bank's insolvency; and (2) for a declaration that approximately 4500 acres of farmland and several "participation" notes in the hands of UCB must be turned over to the receiver. Edward Tubbs, the plaintiff in this case, is presently serving as receiver. The district court denied all relief, and the receiver appealed.

The appeal was submitted to the court of appeals which held, on the equity claims, that the receiver was entitled to a lien on the farmland but not to the return of the participation notes. For some reason, it did not rule on the law issues of aiding and

abetting and conspiracy. On further review, we affirm the court of appeals on the equity issues but modify the decision by resolving the law issues on their merits. The decision of the district court is affirmed in part and reversed in part.

The picture that emerges in this case is one of a small town bank, uninsured and unregistered, which survived on the trust and confidence of the Bloomfield community. Long before the bank was closed in 1983, it lost its life blood to previous owners who supported opulent life-styles and ill-fated business ventures through interest-free overdrafts in the bank. As a result, the bank became insolvent many years before the recent farm crisis caused problems in other Iowa banks. Because Exchange Bank was not subject to banking department inspections, members of the Bloomfield community remained unaware of the bank's true financial condition until it was closed in 1983.

Exchange Bank was founded in 1871 by Amos Steckel. In 1919, the Iowa legislature passed a law requiring all banks to be chartered and regulated but provided an exception or "grandfather" provision for existing banks. Exchange Bank was one of them. At the time it closed, Exchange Bank was one of only four such unregulated banks. These banks had no statutory requirements with respect to financial disclosure, capital requirements, lending limits, restrictions on loans to related parties, loan documentation, or outside examinations. The present case is a vivid testimonial to the need for state regulation of banks.

After the death of Amos Steckel, his son, W.J. Steckel, ran the bank. The large overdrafts, which ultimately caused the bank's collapse, apparently began with W.J. Steckel, who maintained an account entitled the "W.J.S." account, which was permanently in the red, in large amounts. W.J. Steckel operated the bank until his death in 1940. In the meantime, Edward Burchette, who married Steckel's daughter, Josephine, began working at the bank. When W.J. Steckel died, Edward became president, although the record shows he has never had much interest or aptitude in banking. When Edward's mother-in-law died in 1947, ownership of Exchange Bank and substantial other assets passed to Edward's wife, Josephine. Josephine died in 1951, and her estate passed to Edward.

As the estate of each successive owner of the Exchange Bank was administered, the probate proceedings included a recorded statement by the estate representative that all of the assets of the Steckel family would remain behind the Exchange Bank deposits. Included in the Steckel assets, in addition to the bank, were approximately 4500 acres of farmland and other personal property.

The farmland and other Burchette assets were considered by members of the community to be a part of the Exchange Bank and were described by some as the "backbone" of the bank. Even the vehicles used in connection with the farming operations displayed the bank's name.

In 1954, Edward married Lucille Morrison, widow of the largest stockholder in a bank then known as Valley Bank of Des Moines. Through this marriage, Edward became the chairman of the board of directors of Valley Bank. Presumably because of Edward's extensive bank connections, the Bloomfield community considered him to be a man of substantial means, and he maintained a lavish life-style. After his marriage to Lucille, Edward maintained two homes, one in Des Moines and one in Bloomfield, and he often commuted between the two by chauffeur-driven limousine.

This defendant, UCB, became involved with Exchange Bank when UCB became its "correspondent" bank. A correspondent bank processes the checks of a bank such as the Exchange Bank, which has no access directly to the federal reserve system. The correspondent bank also furnishes overline credit for borrowers of the "downstream" bank whose credit needs exceed its *legal* lending limit (not applicable to Exchange Bank as an unregistered bank) or for borrowers whose needs exceeded the *financial* capability of the local bank. In the case of Exchange Bank, the participation

loans from its correspondent banks were not used to furnish overline credit to the Exchange Bank customers but to actually keep the bank itself afloat. This apparently was not known to persons outside of the Exchange Bank.

For many years, Exchange Bank had used the Union Bank and Trust Company of Ottumwa (Union) as its correspondent bank. In 1974, Union and Valley Banks were acquired by the Banks of Iowa, and Edward's Valley Bank stock became Banks of Iowa stock. The Banks of Iowa acquisition of Union Bank resulted in a conflict of interest for Edward because he was now a member of the board of directors of Banks of Iowa board and therefore subject to a $5000 borrowing restriction imposed by banking regulations. Edward resigned as a board member.

For a considerable time, Union experienced overdraft problems with the Exchange Bank's correspondent account. To rectify this problem, Edward borrowed $700,000 from the Continental Bank in Chicago, secured by his Banks of Iowa stock. Soon Exchange Bank was again overdrawn. This was resolved by Edward borrowing $1.3 million from the Chicago bank which was eventually paid in full with Edward's Banks of Iowa stock and covered the overdraft.

Throughout this period, Union and Banks of Iowa urged Edward to obtain a charter for Exchange Bank and make it a regulated bank. In preparation for that possibility, a financial audit was done, revealing that family-related overdrafts of $1.3 million and family-related loans in the amount of $1.5 million had created serious liquidity problems. This information was relayed to the Iowa Department of Banking, but no action was taken, because Exchange Bank remained an unregulated bank.

When Exchange Bank's account with Union returned to an overdrawn status, the Banks of Iowa advised Edward that it could no longer do business with Exchange Bank unless it was chartered. That did not occur, and the correspondent relationship between Union and Exchange Bank was terminated.

At the time Exchange Bank was having difficulties with Union, the Iowa securities department wrote all four private banks then in existence, including Exchange Bank, expressing concern that a private bank's certificates of deposit were "securities" subject to the registration requirements of the Iowa securities law. Newspaper articles appeared concerning this problem, and it was general knowledge in the banking community. The securities department, however, did not pursue this matter further.

*Exchange Bank–UCB Relationship.*

Through the efforts of a Des Moines law firm, Exchange Bank in 1976 opened a correspondent account with UCB when its relationship with Union was terminated. UCB was told that the reason for the Exchange Bank's moving its account was the conflict of interest created by Edward's involvement as a board member with the Banks of Iowa. In truth, Exchange Bank was seeking a new correspondent bank because Union had terminated its relationship with it. UCB was advised that the Exchange Bank would like to use participation agreements to meet its liquidity needs, and UCB agreed to provide liquidity up to $1.2 million. UCB did not request or obtain any financial statements from the Exchange Bank until July or August of 1982. And, although UCB ordinarily contacted other correspondent bankers concerning its new accounts, it did not do so here.

*The Transfer of the Exchange Bank to Peter and Nan Burchette.*

The next few years were rather uneventful, although efforts were still being made to restructure and charter the Exchange Bank. In 1980, Edward became critically ill and was not expected to live long. Edward's lawyers devised a plan to avoid public revelation of the financial condition of Exchange Bank in Edward's probate proceedings. This plan included an inter vivos transfer of the bank to avoid the disclosure in a probate inventory of the bank's financial problems.

The plan called for the bank to be transferred as of January 7, 1981, to Edward's

children, Peter Burchette and Nan Burchette Cameron. Edward was to give an unsecured, noninterest-bearing note to the Exchange Bank in the amount of $3,578,521, which was the amount calculated to be the deficit. Payments of the note were to be made by transfers of Edward's farmland to Peter and Nan. The plan was implemented in part; however, the farmland was never actually transferred to Peter and Nan.

Edward executed a "Notice of Change of Ownership" and a "Verified Statement of Change of Ownership of Business Conducted Under a Trade Name," which stated that Edward continued to "make available" all of his farms, bank stocks and other assets, both real and personal, for the security of the Exchange Bank customers. On advice of Edward's lawyers, an earlier draft of this recitation which "pledged" the assets was changed to "make [them] available." The lawyers felt that this would avoid a lien on the land. This notice of change of ownership was recorded in the Recorder's Office and was briefly posted in the bank. According to Edward's lawyers, the verified statement and notice were intended to create a "comfort statement" for the depositors of the bank. UCB learned of the transfer to Nan and Peter on January 29, 1981; however, its officers still believed that Edward had guaranteed the liabilities of the bank with all of his assets and that those assets were sufficient to cover the bank's shortages.

*The 1982 Liquidity Crisis.*

During the summer of 1982, the balance of the Exchange Bank participation loans at UCB increased to $3.3 million, which was near UCB's lending limit. On July 13, 1982, Exchange Bank's correspondent account went into overdraft status and remained there until August 4, 1982, an unusually long period for an overdraft of this size. UCB insisted that the liquidity problem be resolved under threat of a termination of its correspondent relationship. Edward deposited $598,000 by cashing certificates of deposit and his remaining Banks of Iowa stock.

In the summer of 1982, UCB requested and received Exchange Bank financial statements which showed the bank with insufficient assets to cover its liabilities, revealing a negative capital of $200,000 and an overdraft of $950,000. It also appeared that Edward owed the Exchange Bank over $3 million. He had virtually no liquid assets, but he continued to own the farmland, which appeared to be adequate to fill the "hole" in Exchange Bank.

Continuous attempts were made to sell Exchange Bank but to no avail. By August 1982, UCB became aware of the critical nature of Exchange Bank problems. It felt the only solution would be for Exchange Bank to obtain a charter and sell the assets owned by the Burchettes. By December of 1982, UCB's concern for its position deepened, and it began to demand collateral for its participation loans. It also looked harder at the Burchette farmland as a source of security, demanding mortgages on the various tracts of farmland, again under threat of terminating its business with the Exchange Bank.

Edward agreed to execute the mortgages on condition that they not be recorded without "reasonable" notice. In February 1983, mortgages were executed, but they were never recorded, because UCB was uncertain what "reasonable" notice meant. The parties agreed that the Exchange Bank would repurchase on demand of UCB any participation loans which were in default. Peter and Nan, then the owners of the bank, guaranteed that commitment, and Edward agreed to collateralize the agreement by granting a replacement mortgage on the farmland.

*The Events of 1983.*

Commencing in April 1983, UCB was the subject of a routine bank examination. The examination report concluded that Exchange Bank, as a UCB customer, was extremely illiquid and that its loans with UCB were substandard. Officers of UCB reviewed in depth its files with respect to Exchange Bank, and an internal memorandum stated that, "for all practical purposes, UCB is the only thing keeping this bank's doors open. This situation demands

close attention until resolved." It appeared that $5 million would be needed to balance the shortfall.

Negotiations for the sale of Exchange Bank still had produced no results, and UCB's memoranda indicated that the Burchettes were prime candidates for bankruptcy. In early August 1983, UCB officers visited with the Burchettes to appraise the farmland, and later wrote to Edward, stating that UCB would unilaterally record its mortgage after September 1.

On August 29, 1983, representatives of UCB traveled to Bloomfield and conducted an in-depth examination of Exchange Bank for the first time. It was only then that UCB was aware of the true condition of Exchange Bank. It was a disaster. On August 31, UCB arranged a meeting with the Exchange Bank owners and the Superintendent of Banking. The groundwork was laid for an examination if the bank were sold. On September 2, UCB recorded its new mortgage.

On September 5, 1983, Exchange Bank requested supervision from the Iowa Department of Banking, and an examination was commenced the next day. On September 13, 1983, the Superintendent closed the bank, and a receivership was established.

Depositor claims in the receivership were originally $17,438,000, but they have now been reduced. They now exceed receivership assets by approximately $7,000,000, without consideration of the farmland and participation notes involved in this appeal.

## I. *The Tort Claims.*

A. *Aiding and abetting.* The receiver alleged that UCB aided and abetted the principals of Exchange Bank in committing fraud, breaches of fiduciary duties, and securities law violations. The district court found against the receiver on the ground of insufficient evidence.

This portion of the case was tried at law, and our review is therefore on error. The rule is that

[w]hen the trial court in a law action tried to the court denies recovery because of a party's failure to carry his

burden on an issue, we will not interfere on appeal unless we find the party carried his burden as a matter of law. The evidence in the party's favor must be so overwhelming that only one reasonable inference could be drawn. On review we examine the evidence in the light most favorable to the judgment.

*Roland A. Wilson & Assocs. v. Forty–O–Four Grand Corp.,* 246 N.W.2d 922, 925 (Iowa 1976).

The receiver does not challenge this principle, nor does he challenge the district court's findings of fact. He argues, however, that when the court's findings of fact are applied under correct legal standards he is entitled to recover under both the theories of aiding and abetting and conspiracy.

The Restatement of Torts provides this test for liability of persons acting in concert:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979).

In the analogous area of securities law violations, federal courts have said that the requirement of aiding and abetting are:

(1) the existence of a securities law violation by the primary party (as opposed to the aiding and abetting party);

(2) "knowledge" of the violation on the party of the aider and abettor; and

(3) "substantial assistance" by the aider and abettor in the achievement of the primary violation.

*Metge v. Baehler,* 762 F.2d 621, 624 (8th Cir.1985). *See also Woodward v. Metro*

*Bank of Texas*, 522 F.2d 84, 95 (5th Cir. 1975); *cf. Halbertsam v. Welch*, 705 F.2d 472, 483–84 (D.C.1983) (claim of conspiracy).

"Knowledge" of the principal's act, under the federal securities cases, has been interpreted to be less than actual knowledge; a general awareness has been held to be sufficient. *See Federal Deposit Ins. Corp. v. First Interstate Bank*, 885 F.2d 423, 430–31 (8th Cir.1989); *Woodward*, 522 F.2d at 95. The receiver argues for this more liberal definition of "knowledge." We will assume, for our analysis of this issue, that "general awareness" by an alleged aider and abettor is sufficient to constitute knowledge. Even under this more liberal definition of knowledge, however, the receiver cannot prevail.

■ The first inquiry is whether the principals, the Exchange Bank owners, committed tortious acts as charged by the receiver. The alleged misconduct of the Exchange Bank principals in selling unregistered securities was not established because it has never been determined that bank certificates are "securities" under our statutes. We will assume, however, that the other alleged wrongs, fraud and breaches of fiduciary duty, were committed by Edward Burchette, although proof of the latter was of doubtful sufficiency. *See Kurth v. Van Horn*, 380 N.W.2d 693 (Iowa 1986) (fiduciary relationship does not arise solely through bank-depositor relationship).

On the element of UCB's knowledge of the alleged tortious acts by Burchette, the receiver points to findings by the district court that UCB knew of Exchange Bank's "illiquid" position for over a year before it closed. This finding by the district court, however, does not necessarily mean that UCB knew that fraud or other tortious acts were being perpetrated by Exchange Bank. UCB was not shown to have known of the extent of the "hole" in the bank, and the financial assets of Edward Burchette, which he had pledged to support the bank, appeared to be adequate to cure the bank's problems.

UCB, moreover, did not know until the very eve of Exchange Bank's closing the extent of the W.J. Steckel and Edward Burchette overdrafts, which were the primary causes of the bank's failure. When the true condition of Exchange Bank became known through the trip by UCB representatives to Bloomfield on the eve of the bank's closing, UCB immediately took steps to bring the problems of the Exchange Bank to a head. We cannot say that, as a matter of law, the district court was wrong in finding that the element of knowledge was not established in the evidence.

■ The district court also found a lack of evidence of "substantial assistance," the third element of aiding and abetting. There is no doubt that UCB's furnishing of liquidity had the effect of keeping Exchange Bank open. But, of course, keeping a bank open when it is insolvent is not enough, by itself, to constitute substantial assistance. Under such a theory, any creditor who delayed enforcement of a claim against an insolvent business, and therefore allowed it to continue operation, could be subjected to a claim of aiding and abetting. For example, a utility company which did not shut off utilities to a delinquent account could conceivably be held liable for aiding and abetting by keeping the business open. The "substantial assistance" required for aiding and abetting obviously must be more than simply allowing the bank to remain open.

While there was evidence from which the fact finder could conceivably have found substantial assistance by UCB, it did not. The district court found that there was insufficient evidence that UCB's liquidity loans were made to give Exchange Bank a false appearance for its own benefit or otherwise substantially assisted any wrongs by Exchange Bank principals. A contrary conclusion is not compelled as a matter of law, and therefore the receiver must fail on this issue.

B. *Conspiracy.* The receiver alleged that UCB conspired with Exchange Bank to commit fraud and other wrongs against its depositors. Conspiracy is, basically, a combination of two or more persons to accomplish, through concerted actions, an unlaw-

ful end or a lawful end by unlawful means. *Countryman v. Mount Pleasant Bank & Trust Co.*, 357 N.W.2d 599, 602 (Iowa 1984). The principal element of conspiracy is an agreement or understanding to effect a wrong against another. *Basic Chemicals, Inc. v. Benson*, 251 N.W.2d 220, 233 (Iowa 1977).

■ The receiver contends that UCB and Exchange Bank had at least a tacit agreement concerning the torts being committed by Exchange Bank. He claims that UCB knew of the fraud committed by Exchange Bank and continued to provide liquidity to permit that to happen. In order for there to be an agreement to accomplish an unlawful end, there must be knowledge of that purpose by the alleged conspirator. As we discussed in regard to the aiding and abetting issue, the court found no such knowledge.

There must also be an agreement. Here, the court concluded that "[t]he evidence simply does not establish that UCB agreed with Exchange Bank to commit a wrong against the depositors of Exchange Bank."

The receiver's conspiracy argument places considerable reliance on *Countryman*, and its sequel, *Adam v. Mount Pleasant Bank & Trust Co.*, 387 N.W.2d 771 (Iowa 1986). *Adam* and *Countryman* arose out of the same factual situation, involving a bank's alleged conspiracy with a grain elevator to defraud customers of the elevator.

The facts in *Countryman* and *Adam*, however, are quite different from those in the present case. In those cases, there was an overlapping of control of the bank and the elevator. Members of the board of directors of the bank were also involved in the operation of the elevator. Several violations of Iowa banking laws were established, and there was evidence that the bank principals had kept the elevator's financial problems quiet so as to gain personally through the sale of their bank stock. Similar facts are not found in the record here.

Most important, the fact finder in the *Countryman–Adam* cases found that the conspiracy had been established under the evidence. In this case, it found just the opposite. In order to prevail, the plaintiff would have to prove the conspiracy as a matter of law. He has not done so.

We agree with the district court that the claim of conspiracy was not established. This brings us to the equitable issues.

## II. *The Equitable Issues.*

The receiver claims that the Exchange Bank depositors are entitled to an equitable interest in the Burchette farmland and all future payments under the participation loans between Exchange Bank and UCB. The district court denied all equitable relief, and the court of appeals affirmed as to the participation notes. As to the farmland, however, the court of appeals held that an equitable lien should be impressed on the land on behalf of the depositors. Our review in this equitable phase of the case is de novo.

A. *The farmland.* As already noted, the farmland owned by the Steckels, and later the Burchettes, had been held out for many years as an asset available to secure deposits of the customers of Exchange Bank. This was made clear in the estate records of W.J. Steckel, his widow and his daughter, all of which contained statements by the personal representative that the farmland and other Burchette assets would remain available for the depositors.

When Edward Burchette transferred the bank to Peter and Nan in 1980, the notice of transfer discussed in division I was recorded in Davis County. It stated:

[T]he undersigned, EDWARD BURCHETTE, continues to make available all of his farms, bank stocks and other assets, both real estate and personal, for the security of Exchange Bank.

Officers of UCB were aware of the statement by Burchette to the effect that his land would be available to the Exchange Bank depositors.

The receiver argues that Edward Burchette's mortgage to UCB was fraudulent as to the Exchange Bank depositors and that the depositors are entitled to equitable claims against the land with priority over

UCB's mortgage. He raises theories of equitable liens, constructive trust, equitable subordination, and estoppel.

As to the lien argument, we have stated that

> equitable liens are generally recognized, [however] the doctrine is one of obscure definition. It has been said it is "difficult to give an accurate and comprehensive definition of the term equitable lien and, ... it frequently has been stated such a lien is a right not recognized at law, to have a fund or a specific property, or its proceeds, applied in whole or in part to the payment of a particular debt or class of debts."

*Smith v. Village Enters., Inc.*, 208 N.W.2d 35, 38 (Iowa 1973) (quoting 51 Am.Jur.2d *Liens* § 22 (1970)).

As we noted in *Smith*, the concept of equitable lien may cover many varying factual situations. *Smith*, 208 N.W.2d at 38. The equitable lien is said to be a restitution concept applied by courts of equity to avoid injustice and particularly to avoid unjust enrichment. Restatement of Restitution § 161 (1937). The lien may arise either by the express contract of the parties or by implication under equitable principles. In *Farmers & Merchants Bank v. Commissioner of Internal Revenue*, 175 F.2d 846, 849 (8th Cir.1949), the Court stated:

> An equitable lien arises either from either a written contract which shows an intention to charge some particular property with the debt or the obligation, or is implied and declared by a court of equity out of general considerations of a right and justice as applied to the relations of the parties and the circumstances of their dealings.

■ The receiver argues that he is entitled to an equitable lien on the bases of express contract and general equitable principles of "right and justice." The evidence, we believe, supports an equitable lien under the express contract theory, thus it is unnecessary to address the receiver's alternative equitable arguments.

Edward Burchette, and his predecessors, as owners of the farmland, went to great lengths to assure the Exchange Bank depositors that their deposits were safe, despite the fact that federal deposit insurance was not available to a private bank such as Exchange Bank. The basis for that confidence was the availability of the farmland. UCB had actual and constructive notice of those commitments before it took the mortgages on the Burchette farmland.

UCB argues that the public statements and recorded notices to the effect that the land would remain available to the depositors were not intended to be equitable liens, only "comfort statements." The only "comfort" that such notice could reasonably evoke in a depositor, however, was the comfort of knowing that, if the bank went sour, the land would still be there. The language of the public notices to the effect that the land was "made available" to the creditor, rather than "pledged" to them is a distinction without a real difference. The purpose was to create confidence in the depositors that they had a form of home-fashioned deposit insurance. That, we believe, was done with design.

We believe the evidence supports a finding of an equitable lien, and we so hold. Moreover, because this lien existed prior to UCB's mortgage, because of the "pledging" of the land by Edward Burchette, and because UCB had actual knowledge of that fact, the equitable lien in favor of the depositors is entitled to priority over the mortgage to UCB. The equitable lien may be enforced by a separate action in equity. *See* Restatement of Restitution § 161 comment *b* (1937).

B. *The participation notes.* As already discussed, Exchange Bank's liquidity needs were met in large part through participation loans with its correspondent banks. Exchange Bank customers gave their notes, with supporting financial data and security agreements, if any, to Exchange Bank. Exchange Bank then entered into a participation agreement with UCB, which credited Exchange Bank's correspondent account. The original notes remained with Exchange Bank, pursuant to standard practice among banks. Exchange Bank collected the payments and forwarded them to UCB. In most cases, the Ex-

change Bank customers were not even aware that their loans had been "participated."

When Exchange Bank's problems became fully known to UCB, UCB took physical possession of the participation notes. It now claims the right to the future payments under the notes under the theories that (1) it is the owner of the notes, or (2) it has a perfected security interest in them by having taken possession of them. *See* Iowa Code § 554.9302(1).

■ The receiver counters that he is entitled to the future payments under the participation notes because any claim of ownership or security interest on the part of UCB is voidable on the ground that they were fraudulent conveyances; that they are subordinate to equitable liens in favor of the depositors; that enforcement must be denied under general principles of equitable estoppel and that the notes are subject to a constructive trust in favor of the depositors. He argues that the Exchange Bank held out these notes as being a part of the bank's assets, just as had been done with the farmland.

On a procedural matter, UCB argues that, while this claim was filed as an equitable matter, it was tried at law, and the trial court's findings are supported by substantial evidence. The receiver counters that this still retained its equitable character and that our review is de novo. We agree with the receiver; while some of the aspects of the trial suggest that the whole case was tried at law, we believe these issues retained their equitable status, and we therefore examine the facts in regard to those issues de novo.

To support his argument that the attempted security interest is voidable as fraudulent, the receiver contends that UCB allegedly participated in and knew of the fraud on the part of the Burchettes and in permitting Exchange Bank to retain possession of the disputed notes as well as its last minute perfection by seizing possession of them.

It is clear that a security interest in the notes may be obtained by taking possession of them. *See* Iowa Code § 554.9302(1).

Therefore, our only question is whether the security interest is voidable, or is subordinate to the receiver's claims on one of the grounds urged by him. We believe that it is not. First, regarding the receiver's claim of fraud, the evidence is clear that UCB did not know of the true condition of Exchange Bank until the very eve of its collapse, and for the reasons previously discussed, it cannot be found to be guilty of fraud. Retention of the "participated" notes, moreover, was in accordance with established banking practices. There is nothing unusual in permitting the originating bank to retain possession of the original notes, for the purpose of allowing customers to make payments on them and for the originating bank to service the loan.

We also reject the receiver's claim that the notes in question should be subjected to the imposition of an equitable lien in favor of the depositors. The facts which warrant imposition of an equitable lien as to the farmland simply do not exist with respect to the notes, which were never held out as being security for the bank's depositors.

We find no merit in the receiver's claim of priority as to the participated notes and therefore affirm the court of appeals decision in that respect.

In summary, we affirm the district court in its judgment in favor of the defendant, UCB, on the law claims of aiding and abetting and conspiracy and affirm on the equitable claim to the participation notes. We reverse the district court judgment insofar as it denied the receiver an equitable lien on the farmland. We thus affirm the court of appeals decision, with the exception that we reject the law claims of conspiracy and aiding and abetting on their merits. We remand for entry of a judgment and decree implementing this opinion.

DECISION OF COURT OF APPEALS AFFIRMED; JUDGMENT OF DISTRICT COURT AFFIRMED IN PART AND REVERSED IN PART.