### ORDER

IT IS ORDERED that Martin T. Buchholz shall recover from Robert L. Cook the sum of $73,800.00. This recovery is excepted from Robert L. Cook's discharge under 11 U.S.C. § 523(a)(4) and (a)(2)(A). Costs are taxed to Robert L. Cook. Judgment shall enter accordingly.

Irene M. DEWEY, Debtor.

Martin T. Buchholz, Plaintiff,

v.

Irene M. Dewey, Defendant.

Bankruptcy No. 00–00547S.
Adversary No. 00–9090S.

United States Bankruptcy Court,
N.D. Iowa,
Western Division.

March 28, 2001.

Becket & Lee LLP, Malvern, PA, Theodore M. Therriault, Weinstein, Fischer, Riley Erickson & Wolf, P.S., Seattle, WA, for creditor

Wil L. Forker, Sioux City, IA, for debtor.

## DECISION

WILLIAM L. EDMONDS, Bankruptcy Judge.

Martin T. Buchholz asks for judgment against Irene Dewey in the amount of $73,800.00 and that the judgment be excepted from discharge under 11 U.S.C. §§ 523(a)(4) and (a)(2)(A). Trial was held February 21, 2001 in Sioux City. Steven R. Jensen appeared as attorney for Buchholz; Wil L. Forker appeared as attorney for the debtor, Irene M. Dewey. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

### Findings of Fact

Martin T. Buchholz is 91 years old and lives in a nursing home. He was not able to attend the trial. Irene Dewey's fiancé is Robert L. Cook, Buchholz's nephew and godchild. Cook is in his early fifties. In the spring of 1997, Cook began regular visits to his uncle's home in Bancroft, Nebraska. Cook also lived in Bancroft. Cook worked the night shift for Gateway computers in North Sioux City, South Dakota. He would visit his uncle during the day and sometimes at night when he got off work.

Before the spring of 1997, one of Cook's aunts was helping Buchholz with his finances. Buchholz was one of 15 children. Other family members, including Buchholz's younger brother Willis and his sister-in-law Phyllis, wanted someone other than the aunt to help Buchholz with his

finances. Cook agreed to do it, but he wanted some other family member to help also. In early May 1997, Buchholz executed a "Durable Power of Attorney" naming Cook his attorney-in-fact with authority to control Buchholz's bank accounts, real estate, and personal property. The power gave Cook the authority to gift or to sell any of Buchholz's property. The power of attorney was drafted by Buchholz's attorney and executed at the attorney's office. On the day Buchholz executed the power of attorney, Cook called Phyllis and asked her to come to the attorney's office so that she also could be given power of attorney for Buchholz. Phyllis is employed as the Clerk of Court for Thurston County, Nebraska. She went to the lawyer's office and either the same day or soon after, Buchholz signed a Durable Power of Attorney naming Phyllis also as his attorney-in-fact (exhibit 4).

Buchholz kept control of his checkbook, continuing to sign checks. Cook also signed checks to pay some of Buchholz's bills. At the time, Buchholz was 88 or 89 years old.

Prior to 1997, Cook went through a divorce. Afterward, he had substantial debts. At Gateway, he earned $8.50 per hour. He had very little money left over each month after paying his basic, necessary living expenses. He was "living paycheck to paycheck."

In February 1998, Cook began dating Dewey who was a fellow employee at Gateway. Dewey was getting divorced. Her husband had left her in December 1997; she filed for divorce that month. Her divorce became final on April 30, 1998. At the time, she was living on an acreage near Akron, Iowa. As part of her dissolution, it was agreed that if she paid all the couple's marital debts, she would receive the acreage where she lived and two motor vehicles, including a Jeep. She could not afford to pay these debts in full at the time.

On December 10, 1997, Buchholz signed a check for $38,000.00 to the First National Bank to enable Cook to obtain a cashier's check for that amount. Cook used the cashier's check to start an investment fund in his own name at Norwest Bank in Sioux City. The account was for Buchholz's benefit. Cook had offered to help Buchholz with his investments, and Cook had discussed his idea for the investment with Buchholz and Phyllis. Cook said he was told by Buchholz to put the investment account in Cook's name. Cook told Phyllis that he was supposed to put it in Cook's and Phyllis' names but that he put it in his name only because he did not know her social security number.

On March 10, 1998, Cook obtained a second cashier's check from First National Bank in Bancroft (attachment to exhibit 2). It was in the amount of $26,000.00. Cook testified that he used the money to pay off his own debts, but he testified that some may have been transferred to Irene Dewey. In a deposition, he admitted that the money went to Dewey to enable her to pay off her debt on her Jeep motor vehicle. Dewey testified that she received between $24,000.00 and $25,000.00 from Cook to pay off the Jeep loan. She said Cook wrote the check directly to Norwest, the secured creditor with the interest in the Jeep. Cook told her he had borrowed the money from his uncle. At the time, the couple was planning to get married. Dewey knew that Cook was Buchholz's attorney-in-fact. I find that Cook transferred the entire $26,000.00 to Dewey for her use. Cook testified that he considered it a loan to Dewey. He said he expected to be repaid, but he did not discuss repayment terms with her because of their relationship. Dewey testified that she thought it was a gift.

On April 28, 1998, Cook obtained a third cashier's check from First National Bank

(attachment to exhibit 2). It was in the amount of $38,000.00. Cook said he used the money to pay his debts and some of Dewey's debts. Dewey said Cook gave her the money, and she used it to pay off her remaining marital bills. The payment enabled her to retain the acreage and the two vehicles.

I find that the entire $38,000.00 was transferred to Dewey to enable her to pay marital debts. After paying the marital debts, Dewey sold her acreage near Akron. She used the equity she received from the sale as a downpayment to buy a house at 941 Reed Street in Akron. At the time of the purchase, in May 1998, the warranty deed for the home was made to Dewey and Cook as joint tenants with rights of survivorship. The purchase price of the home was $111,000.00. Dewey and Cook signed a promissory note to Firstar Bank for $88,000.00 to finance the purchase. In August 1999, Cook quitclaimed his interest in the house to Dewey. Cook has referred to Dewey as his "paramour." He has lived with her "on and off" since they began dating. They became engaged about a year ago.

Dewey knew that Cook had obtained the money from Buchholz. She said she thought they were loans to Cook. She testified that at the time Cook gave her the money, she would not have had the ability to repay Cook.

Cook maintains that the $26,000.00 he received in March and the $38,000.00 he received in April were loans from Buchholz. He said he discussed the loans with his uncle and that he promised to pay his uncle back. Cook said the money came from Buchholz's bank account. It may be that bank certificates of deposit owned by Buchholz were redeemed in order to obtain the March and April cashier's checks.

On a visit to Buchholz, Willis Buchholz learned from Martin that Martin's check-ing account was overdrawn. Willis, Martin, and Phyllis visited Cook in Akron sometime in late April, seeking an explanation. Cook's only explanation was that Phyllis must have been writing checks.

Willis said he examined Buchholz's checking account and discovered the transactions leading to the purchase of the cashier's checks. He drove to Gateway to talk to Cook and confronted him about the checks. He said he got "no real answer."

Cook's power of attorney was revoked. Buchholz gave Willis power of attorney. Willis and Phyllis, on Buchholz's behalf, reached an agreement with Cook on the return of funds (exhibit 2). Both sides were represented by attorneys. A "Letter of Understanding" was executed on June 16, 1998.

Under the agreement, Cook agreed to return the balance of the investment account at Norwest. Cook agreed to have his house in Bancroft appraised and to transfer the property to Buchholz. The value of the transfer would be determined by the valuation of an appraiser to be selected jointly by the attorneys. After the return of the investment account and the transfer of the Bancroft property, any remaining balance of the $102,000.00 would be repaid within 60 days. The agreement provided for the execution of a promissory note for the unpaid balance and the execution of a deed of trust or mortgage to secure the unpaid balance. It is not clear from the agreement whether there was additional property to be used as security for the unpaid balance or whether the parties intended that the Bancroft home was to be mortgaged until it was transferred (see ¶¶ 2 and 3, exhibit 2). The lack of clarity on this point does not affect the court's decision.

Cook signed a promissory note to Buchholz for $50,000.00 (exhibit E) and a Deed

of Trust (exhibit C). The Bancroft property was never sold or transferred to Buchholz. Cook mortgaged the property to Countrywide Home Loans, Inc. to obtain money to pay his debts including his legal bills.

Of the $38,000.00 invested through Norwest, only $27,000.00 was returned to Buchholz. These funds were returned on August 6, 1998. Cook claims that stock market losses caused the shortfall. He testified that if he had not been forced to cash in the investment, Buchholz would have earned ten times his investment. The documentary evidence does not bear out the stock market loss explanation.

As of April 30, 1998, the investment account contained the following shares of stock:

| | |
|---|---|
| money market fund | 23.98 shares |
| AIM Value Fund | 272.093 shares |
| Fidelity Advisor High Yield | 1,217.999 shares |
| Norwest ADV Small Company | 931.966 shares |
| Norwest ADV Income Equity | 263.462 shares |

The total value of the portfolio was then $47,983.29 (exhibit 9).

As of May 29, 1998, the investment account was valued at $28,857.47 (exhibit 9). The per share value of the funds was not significantly different, but the number of shares was. The shares at the end of May were as follows:

| | |
|---|---|
| money market fund | 24.08 shares |
| AIM Value Fund | 141.615 shares |
| Fidelity Advisor High Yield | 861.537 shares |
| Norwest ADV Small Company | 558.060 shares |
| Norwest ADV Income Equity | 151.316 shares |

As of June 30, 1998, the value of the portfolio was $29,246.67 (exhibit 9). Cook did not explain the loss of shares.

In addition to the return of the Norwest money, Cook paid Buchholz only $1,200.00. As stated earlier, Cook did not transfer the house to Buchholz or sell it and pay him the proceeds. In an effort to collect the debt, Buchholz filed suit against Cook in May 1999 in the Nebraska state court. Cook filed his chapter 7 bankruptcy case in this court on April 6, 2000. Dewey filed her chapter 7 case on March 13, 2000.

Cook explains the $64,000.00 in cashier's checks he received in March and April of 1998 as loans agreed to by Buchholz. Cook said he needed the money to pay his debts and that he had a three-fold plan for repaying it. First, the Norwest investment account would earn enough money to repay Buchholz. This explanation was incredible. The investment account was Buchholz's money. Using its earnings to repay Buchholz's loan to Cook makes no sense.

Second, Cook said he proposed to transfer his house in Bancroft to Buchholz. The reason he did not, he says, is that Phyllis would not let him. Third, Cook was to pay Buchholz something every month. Cook said that Buchholz said he was willing to take whatever Cook could afford to pay. Cook said that at one point, Buchholz was willing to take $100.00 to settle the amount in full.

Cook said he and Buchholz were "close," that he intended to pay Buchholz back, and that he did not take Buchholz's "last penny." Cook says Buchholz is worth "a million dollars." At the time of Cook's bankruptcy filing, Cook owed Buchholz $73,800.00.

### Discussion and Conclusions of Law

I have included substantial findings of fact regarding the relationship of Cook and Buchholz and regarding Cook's transactions with his uncle. These are relevant to Buchholz's claim against Dewey. Buchholz has claimed in a separate adversary proceeding that he was damaged by Cook's defalcation while Cook was acting as his

fiduciary and by Cook's defrauding him. Buchholz has asked for judgment against Cook in the amount of $73,800.00, and he has asked that the judgment be excepted from Cook's discharge under 11 U.S.C. §§ 523(a)(4) and (a)(2)(A).

Buchholz alleged that Cook obtained the $38,000.00 cashier's check in December 1997 in order to invest it for Buchholz and returned only $27,000.00. Buchholz contended that the $11,000.00 loss was a result of Cook's defalcation. In the separate proceeding against Cook, I have found that the loss of $11,000.00 was the result of Cook's defalcation. Also Buchholz claimed that Cook borrowed $26,000.00 in March 1998 and $38,000.00 in April 1998, with no intention of repaying it and that therefore his promise to repay was a fraudulent misrepresentation. I have found that this also was so.

■ The money taken from Buchholz by Cook as a result of the fraud was transferred to Dewey by Cook in order to help her solve her financial problems. Buchholz contends that Dewey conspired with Cook to accomplish the defalcation and the fraud and that therefore judgment should be entered against her also for the loss of $73,800.00 and that the judgment should be excepted from her discharge under the same sections of the Code–11 U.S.C. §§ 523(a)(4) and (a)(2)(A).

■ "Conspiracy is, basically, a combination of two or more persons to accomplish, through concerted actions, an unlawful end or a lawful end by unlawful means." *Tubbs v. United Central Bank, N.A.,* 451 N.W.2d 177, 183–84 (Iowa 1990). The principal element is an agreement or understanding to commit a wrong against another. *Id.* at 184. A conspiracy to defraud is normally shown by circumstantial evidence. *Countryman v. Mt. Pleasant Bank & Trust Co.,* 357 N.W.2d 599, 606 (Iowa 1984). Buchholz must prove the elements of nondischargeable claim by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991). This burden requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence. *Metropolitan Stevedore Co. v. Rambo,* 521 U.S. 121, 117 S.Ct. 1953, 1963, 138 L.Ed.2d 327 (1997).

Buchholz has not proven by a preponderance of the evidence that Dewey conspired with Cook to accomplish the defalcation or the fraud. It is true that she received the benefit of Cook's wrongful acts, but it has not been proven that she agreed with Cook to effect the harm to Buchholz. She needed the money, and she knew Cook was borrowing the $64,000.00 from Buchholz, but there is insufficient evidence from which to find that she knew of any intention of Cook at the time not to repay. This is so also as to the defalcation. The loss there took place substantially in May 1998. There is insufficient evidence on which to base a determination that Dewey conspired with Cook with regard to the loss of funds in the investment account. Buchholz has shown that Cook and Dewey had a close relationship and that Dewey was the beneficiary of Cook's actions. Buchholz has not proven that she joined in an agreement with Cook to accomplish the wrongful acts. Buchholz has failed to prove his claim against Dewey by a preponderance of the evidence, and his complaint should be dismissed.

IT IS ORDERED that the complaint of Martin T. Buchholz against Irene M. Dewey is dismissed. Judgment shall enter accordingly.