# United States Bankruptcy Appellate Panel
## FOR THE EIGHTH CIRCUIT

No. 10-6045

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| David P. Lindsey, | * | |
| | * | |
| Debtor. | * | |
| | * | |
| Northland National Bank, | * | Appeal from the United States |
| | * | Bankruptcy Court for the |
| Plaintiff-Appellant, | * | Western District of Missouri |
| | * | |
| v. | * | |
| | * | |
| David P. Lindsey, | * | |
| | * | |
| Defendant-Appellee. | * | |

Submitted: January 11, 2011
Filed: February 8, 2011

Before KRESSEL, Chief Judge, SALADINO, and NAIL, Bankruptcy Judges.

NAIL, Bankruptcy Judge.

Northland National Bank ("Bank") appeals the June 11, 2010 judgment of the bankruptcy court[1] in favor of Debtor David P. Lindsey. We affirm.

BACKGROUND

In 1985, Debtor and his wife formed Lanadar Corp., a Missouri corporation. Lanadar operated a home improvement, consulting, and sale business. In August 2005, Debtor and his wife transferred certain gold coins to Lanadar to capitalize the corporation.

In June 2005, Debtor and Thomas Clark formed American Distributors, Inc., also a Missouri corporation. American Distributors was a wholesale supply company, selling exterior siding, underlayment products, accessories, and windows.

In early 2006, American Distributors sought and obtained a $750,000.00 loan from Bank.[2] Debtor personally guaranteed the loan, and he and his wife Stacy D. Lindsey (who did not guarantee the loan) submitted a personal financial statement, on which they listed, *inter alia*, gold, silver, and platinum coins valued at $125,000.00 and mutual funds valued at $150,000.00.[3] The financial statement indicated the

---

[1] The Honorable Jerry W. Venters, United States Bankruptcy Judge for the Western District of Missouri.

[2] We are unable to better describe when the loan was made because, with the exception of the personal financial statement described in the next sentence, Bank did not introduce any of the 2006 loan documents at trial.

[3] At trial, Bank introduced four personal financial statements, dated January 1, 2006 (Plaintiff's Ex. 10), December 22, 2006 (Plaintiff's Ex. 9), July 1, 2008 (Plaintiff's Ex. 8), and April 23, 2009 (Plaintiff's Ex. 7), respectively. In its opening brief, Bank references the January 1, 2006 statement in connection with the 2006 loan. However, in his brief, Debtor references the December 22, 2006 statement in connection with the 2006 loan. Because the loan was made in early 2006, we have

mutual funds were owned by "DPL & SDL" (which we take to mean David P. Lindsey and Stacy D. Lindsey), but it did not indicate whether the gold, silver, and platinum coins were owned by Debtor individually, his wife individually, or Debtor and his wife as tenants by the entirety or otherwise.

In August 2008, American Distributors sought and obtained a renewal of the 2006 loan. Debtor again personally guaranteed the loan, and he and his wife (who again did not guarantee the loan) submitted a second personal financial statement, on which they listed, *inter alia*, gold, silver, and platinum coins valued at $160,000.00 and mutual funds valued at $140,000.00. The financial statement again indicated the mutual funds were owned by "DPL & SDL," but it again did not indicate whether the gold, silver, and platinum coins were owned by Debtor individually, his wife individually, or Debtor and his wife as tenants by the entirety or otherwise.

In November 2008, Debtor sought and obtained a release of Bank's second mortgage against Debtor's home – which secured in part American Distributors' indebtedness to Bank – in return for Debtor's pledging a certificate of deposit. Debtor did not submit another personal financial statement at the time.

In June 2009, Debtor and Thomas Clark decided to close American Distributors. After it was liquidated, American Distributors still owed Bank $170,484.20, for which Debtor was liable on his personal guaranty.

On August 7, 2009, Debtor filed a petition for relief under chapter 7 of the bankruptcy code. On December 14, 2009, Bank filed a complaint objecting to Debtor's discharge under 11 U.S.C. § 727(a)(2), (3), (4), and (5) and to determine the dischargeability of Bank's claim under 11 U.S.C. § 523(a)(2)(A) and (B), (4), and (6). Bank's complaint included additional counts for breach of contract, unjust enrichment,

---

used the figures from the January 1, 2006 statement.

fraud and intentional misrepresentation, conversion, corporate piercing/alter ego, and transfers in fraud. The matter was tried, and on June 11, 2010, the bankruptcy court entered judgment in favor of Debtor. Bank timely filed a notice of appeal.[4]

On appeal, Bank challenges only the bankruptcy court's determination that Bank's claim against Debtor is dischargeable under 11 U.S.C. § 523(a)(2)(B).

STANDARD OF REVIEW

Each of the elements of a claim of nondischargeability under § 523(a) must be shown by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-91 (1991). This means the trier of fact must believe the existence of a fact is more probable than its nonexistence. *Buchholz v. Dewey* (*In re Dewey*), 263 B.R. 258, 263 (Bankr. N.D. Iowa 2001) (citing *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 [n.9] (1997)).

Whether a requisite element of a claim of nondischargeability under § 523(a)(2)(B) has been satisfied is a factual determination that is reviewed for clear error. *R & R Ready Mix v. Freier* (*In re Freier*), 604 F.3d 583, 587 (8th Cir. 2010); *First National Bank of Olathe, Kansas v. Pontow,* 111 F.3d 604, 609 (8th Cir. 1997). A finding is clearly erroneous if, after reviewing the entire evidence, the Court is left with the definite and firm conviction that a mistake has been made. *Freier*, 604 F.3d at 587 (quoting therein *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). "Oral findings and conclusions under Rule 52(a) must be liberally construed and found to be in consonance with the judgment if the judgment has support in the record

---

[4] Bank's adversary proceeding was consolidated for trial with another adversary proceeding in which the United States Trustee also objected to Debtor's discharge. The bankruptcy court entered judgment in favor of Debtor in that adversary proceeding as well. The United States Trustee did not appeal.

evidence." *Fonder v. U.S.*, 974 F.2d 996, 999-1000 (8ᵗʰ Cir. 1992) (quoting *Jiles v. Ingram*, 944 F.2d 409, 414 (8ᵗʰ Cir. 1991)) (internal quotation marks omitted).[5]

DISCUSSION

For a debt to be declared nondischargeable under § 523(a)(2)(B), the creditor must prove:

1. the debtor made a written statement;

2. the statement was materially false;

3. the statement was in regard to the debtor's or an insider's financial condition;

4. the creditor reasonably relied on the statement; and

5. the debtor made the statement with an intent to deceive.

11 U.S.C. § 523(a)(2)(B). It is undisputed Debtor and his wife's personal financial statements were written statements and were in regard to Debtor and his wife's financial condition.

A written statement is materially false if it paints a substantially untruthful picture of the debtor's financial condition by misrepresenting information that would normally affect the lender's decision to extend credit. *Premier Bank v. Koester* (*In re Koester*), 437 B.R. 363, 368 (Bankr. E.D. Mo. 2010) (citations therein). Bank argues Debtor and his wife's personal financial statements were materially false in several regards. First, the financial statements did not accurately reflect the ownership of the gold coins. Second, the financial statements did not reflect a lien against the gold

---

[5] Fed.R.Civ.P. 52 applies in adversary proceedings. Fed.R.Bankr.P. 7052.

coins held by Premier Bank, another of Debtor's lenders. Third, the financial statements did not accurately reflect the ownership of the mutual funds.

The bankruptcy court did not consider these inaccuracies and omissions to be material. It found while Lanadar actually owned the gold coins, Debtor and his wife controlled Lanadar and thus had *de facto* control of the gold coins and could have used them to pay their personal debts.[6] The bankruptcy court also found while the lien against the gold coins was not disclosed, the debt owed to Premier Bank was disclosed and it would have been "foolish" or "silly" to assume Premier Bank's claim was unsecured.[7] Finally, the bankruptcy court found while the mutual funds were actually a part of Debtor and his wife's self-employed pension plan, those mutual funds were nevertheless available to Debtor and his wife and could also have been used to pay their personal debt.[8]

[6] In its opening brief, Bank contends the bankruptcy court in effect created a "small business exception" to Missouri corporate and property law. We disagree. The bankruptcy court did not suggest Debtor, his wife, or Lanadar could be *compelled* to use the gold coins to pay Debtor and his wife's personal debts.

[7] The financial statements do not indicate the gold coins were owned free and clear of liens. Consequently, we question whether the failure to reflect Premier Bank's lien against the gold coins amounts to a misrepresentation, and even if it does, whether that misrepresentation is fairly attributable to Debtor. Nothing in the record suggests Bank told Debtor how to prepare the financial statements, what information should be included on them, or how that information should be presented.

[8] We also question whether Debtor and his wife's treatment of the mutual funds amounts to a misrepresentation. On the first page of each of the financial statements, there is a line item for "Cash Value Life Insurance, Pension Fund, IRA, Gold & CDs," with a reference to "schedule I." While there are slight differences in the respective schedules I, each includes, *inter alia*, a line item for "IRAs" or "IRA'S & Annuities" and a line item for "Mutual Funds." In his brief, Debtor argues because they were clearly not life insurance, gold, or CDs, the mutual funds could only have comprised either the pension funds or the IRAs listed on the first page of the financial statements. Taking Debtor's argument one step further, because the IRAs are separately

Each of these findings is supported by the record. In essence, the bankruptcy court found Debtor and his wife's financial statements did not paint a substantially untruthful picture of their financial condition and thus those financial statements were not materially false. We cannot say that finding is clearly erroneous.

Whether a creditor reasonably relied on a written statement must be determined in light of the totality of the circumstances. *Pontow,* 111 F.3d at 610 (citations therein).

> "Among other things, a court may consider 'whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.' [*Coston v. Bank of Malvern (In re Coston),* 991 F.2d 257, 261 (5th Cir. 1993.]" [*Sinclair Oil Corp. v. Jones* (*In re Jones*), 31 F.3d 659, 662 (8th Cir. 1994)].

*Id.* Bank argued in its opening brief and at oral argument the bankruptcy court applied a higher standard of reliance than required by § 523(a)(2)(B). We disagree. The bankruptcy court's statement upon which Bank relies, *i.e.*, "I don't believe that the bank *seriously and primarily* relied on [Debtor and his wife's financial statements]" (emphasis added), is only a small part of a lengthy soliloquy and cannot be taken out of context. The bankruptcy court earlier and unambiguously stated, "I don't believe the bank relied on these financial statements in making extensions of credit." Liberally construing the bankruptcy court's oral findings, *Fonder*, 974 F.2d at 999-1000, we do not believe the bankruptcy court applied an incorrect standard of reliance.

------

denominated on both the first page of the financial statements and on the respective schedules I, the mutual funds must necessarily have comprised the pension funds.

In any event, we do not reach the question of whether Bank *reasonably* relied on Debtor and his wife's financial statements, because the bankruptcy court found Bank did not rely on them at all.[9] Ken Roberson, a former officer of Bank, testified Bank did in fact rely on Debtor and his wife's financial statements. However, the bankruptcy court was not required to accept Roberson's testimony as true. *See Blodgett v. Comm'r*, 394 F.3d 1030, 1036 (8ᵗʰ Cir. 2005) (citations therein). Moreover, Roberson undercut his own testimony when he admitted on direct examination, "[I]t's basically character capacity and the credit history of a borrower when you're doing an analysis of a loan. In this case, we had credit history, so – which was good." The bankruptcy court noted a number of other factors upon which it found Bank *did* rely, *e.g.*, Debtor's years of dealing with Bank, his good credit history, his track record of paying his debts, his good credit report, and his good relationship with Bank. The bankruptcy court could have found Bank also relied on

---

[9] We note, however, the record would support a finding that Bank did not reasonably rely on Debtor and his wife's financial statements. As noted above, Debtor and his wife's financial statements do not indicate who owned the gold coins. At most, because they are joint financial statements, they can be read to say Debtor *or* his wife *or* Debtor and his wife, possibly as tenants by the entirety, owned the gold coins. *Cutcliff v. Reuter* (*In re Reuter*), 427 B.R. 727, 775 (Bankr. W.D. Mo. 2010) (citations therein) ("[A]ny conveyance of property to a husband and wife is presumed to create a tenancy by the entirety."). The financial statements also indicate Debtor and his wife, again possibly as tenants by the entirety, owned the mutual funds. Under the circumstances, to the extent Bank presumed – without confirming who actually owned the gold coins or the mutual funds – those assets would be available to satisfy its claim against Debtor, its reliance on the financial statements was both misplaced and unreasonable. Under Missouri law, property held in a tenancy by the entirety cannot be seized to satisfy the individual debts of one of the spouses. *Cutcliff*, 427 B.R. at 775 (citation therein). At oral argument, Bank's counsel attempted to draw a distinction between "credit analysis" and "collectability." Counsel did not, however, satisfactorily explain why the fact the gold coins and the mutual funds could have been owned by Debtor and his wife as tenants by the entirety allegedly did not affect Bank's credit analysis but the fact the gold coins were owned by Debtor and his wife's closely-held corporation would have affected its credit analysis.

Debtor and his wife's financial statements, but it did not. Giving due regard to the bankruptcy court's opportunity to assess Roberson's credibility as a witness, Fed.R.Bankr.P. 8013, we cannot say the bankruptcy court's finding that Bank did not rely on Debtor and his wife's financial statements is clearly erroneous.

Finally, with respect to the necessary intent to deceive,

> Because direct proof of intent (*i.e*., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. *See* [*Webster City Production Credit Association v. Simpson* (*In re Simpson*)], 29 B.R. 202, 211 (Bankr. N.D. Ia. 1983). *Accord* [Jordan v. Frye (*In re Frye*)], 48 B.R. 422, 427 (Bankr. M.D. Ala. 1985); [*Municipal Credit Union v. Brown* (*In re Brown*)], 55 B.R. 999, 1004 (Bankr. E.D.N.Y. 1986). When the creditor introduces circumstantial evidence proving the debtor's intent to deceive, the debtor "cannot overcome [that] inference with an unsupported assertion of honest intent." [*Simpson*], 29 B.R. at 211-12. *The focus is, then, on whether the debtor's actions "appear so inconsistent with [his] self-serving statement of intent that the proof leads the court to disbelieve the debtor."* [*Heinold Commodities & Securities, Inc. v. Hunt* (*In re Hunt*)], 30 B.R. 425, 441 (M.D. Tenn.1983).

*Caspers v. Van Horne* (*In re Van Horne*), 823 F.2d 1285, at 1287-88 (8th Cir. 1987) (emphasis added). Bank essentially argues because Debtor knew he did not own the gold coins, because he knew Lanadar had pledged the gold coins to Premier Bank, and because he knew the difference between owning the mutual funds directly and having an interest in a self-employed pension plan in which the mutual funds were held, the bankruptcy court was *required* to find Debtor intended to deceive Bank. We disagree. The bankruptcy court considered the entire record and – despite its initial assessment of Debtor's chances of prevailing, *i.e.*, "no prayer" – was not led to disbelieve Debtor.

Foremost, the bankruptcy court specifically found Debtor was "credible" and testified "truthfully."  It also found Debtor disclosed all assets, including the gold coins, and all liabilities, including the debt owed to Premier Bank, on the financial statements. The bankruptcy court also found Debtor was cooperative and attempted to work with Bank.[10]  While there was evidence in the record that may have permitted the bankruptcy court to find otherwise, that does not mean the bankruptcy court's finding that Debtor lacked the requisite intent to deceive Bank is clearly erroneous, *Pontow*, 111 F.3d at 610, and we not believe it to be so.

## CONCLUSION

Having found no clear error in the bankruptcy court's findings that not every element of § 523(a)(2)(B) had been shown by a preponderance of the evidence, we affirm the bankruptcy court's judgment determining Bank's pre-petition claim against Debtor is not excepted from discharge under that provision.

--------------------

--------------------

[10] In its opening brief, Bank contends the bankruptcy court was referring to Debtor's efforts to cooperate with Bank after the loan went bad.  Reading the bankruptcy court's comments in context, we think the bankruptcy court was instead referring to all of Debtor's dealings with Bank.