In re Larry H. JONES and Ruth M. Jones, Debtors.

SINCLAIR OIL CORPORATION, Appellant,

v.

Larry H. JONES, Appellee.

No. 93–3918.

United States Court of Appeals, Eighth Circuit.

Submitted April 13, 1994.

Decided Aug. 2, 1994.

Martha J. McAlister, Little Rock, AR, argued, for appellant.

Ronald L. Boyer, Rogers, AR, argued, for appellee.

Before RICHARD S. ARNOLD, Chief Judge, HENLEY, Senior Circuit Judge, and BEAM, Circuit Judge.

HENLEY, Senior Circuit Judge.

Sinclair Oil Corporation (Sinclair) appeals from a judgment of the district court[1] upholding a decision of the bankruptcy court[2] dismissing its complaint for a declaration of nondischargeability of a debt in the bankruptcy proceeding of Larry H. Jones. We affirm.

Jones was the president and sole shareholder of Eudy Oil Company (Eudy) and Roberts Oil Company (Roberts), which were in the wholesale gasoline distribution business. Jones purchased the companies in December 1986 and financed the purchases by borrowing $300,000.00 from the First National Bank of Siloam Springs (FNBSS). He executed a promissory note to FNBSS in his individual capacity and pledged the companies' inventory and accounts receivable as collateral. In February 1991, Jones renewed the loan to FNBSS and executed a note for $400,000.00 individually and as president of the oil companies.

Before Jones purchased Eudy and Roberts, Sinclair had supplied the companies with gasoline on credit. To continue the credit arrangement, Jones executed personal guarantees with Sinclair. Sinclair requested corporate financial statements every year and Jones' personal financial statements every other year. The debt to FNBSS was disclosed on Jones' personal statements, but not on the corporate statements.

In early 1991, the oil companies were over their credit lines and had problems with past-due invoices. As a result, in April 1991, Sinclair placed the companies on electronic funds transfer. However, credit problems persisted. On September 20, November 1 and November 11, 1991, drafts on the Roberts' account were returned for insufficient funds. Funds were eventually wired to cover the drafts, and Sinclair permitted the companies to continue purchasing gasoline on credit until November 19, at which time the companies owed Sinclair approximately $256,978.00.

On November 21, 1991, Jones and his wife filed a Chapter 7 petition. 11 U.S.C. § 302(a). Sinclair filed a complaint, asserting that Jones, as guarantor, was responsible for the companies' debt and further claimed that the debt was nondischargeable under 11

---

1. The Honorable H. Franklin Waters, Chief Judge, United States District Court for the Western District of Arkansas.

2. The Honorable Robert F. Fussell, United States Bankruptcy Judge for the Eastern and Western Districts of Arkansas.

U.S.C. § 523(a)(2)(B). That section provides that a debt is nondischargeable if credit was obtained by use of a written statement:

  (i) that is materially false;

  (ii) respecting the debtor's or an insider's financial condition;

  (iii) on which the creditor . . . reasonably relied; and

  (iv) that the debtor caused to be made . . . with the intent to deceive.

Sinclair argued that the companies' 1991 financial statements were false because they did not disclose the debt to FNBSS and that Sinclair had reasonably relied on the statements in extending credit.

At the bankruptcy hearing, Jones testified that he did not intend to deceive Sinclair by omitting the debt on the corporate statements. He explained that he believed the debt was a personal obligation because he initially executed the promissory note in his individual capacity. He further explained that because he disclosed it on his personal financial statements, which he sent to Sinclair every year along with the corporate statements, and because he was the sole shareholder and guarantor, he believed that "logically" Sinclair would have reviewed the statements together. Jones also testified that when he signed the personal guarantees, he told Sinclair about the FNBSS loan.

Doug Darrington, Sinclair's wholesale credit manager, also testified. He stated that he established the companies' credit line in August of every year and relied on the corporate financial statements dated March 31 of that year. He testified that although he reviewed Jones' personal financial statements, he did not rely on them in extending credit to the companies. He stated that he had not received Jones' 1991 statement, but in August 1991 had reviewed his 1990 statement and concluded Jones had a negative net worth. Darrington did not ask Jones for an updated financial statement or make any further inquiry. In addition, Darrington did not request updated corporate statements, even though he admitted there were "red flags" which caused him concern about the companies' financial condition. After the returned November 11 draft on the Roberts' account, Darrington monitored both accounts on a daily basis. He explained that he monitored the Eudy account as well as the Roberts' account because of the "same ownership," reasoning "if there's problems in one account, there's probably problems in the other account." Darrington admitted that since 1988 the companies were "fairly marginal" from a credit standpoint, but that in extending credit he took into account that the companies were large accounts and conceded that he had had "a lot of pressure" from the marketing department.

The bankruptcy court held that the corporate financial statements were not materially false because the FNBSS debt was Jones' personal liability. In the alternative, the court held that Jones did not have an intent to deceive, noting that Jones had included the debt on his personal financial statements which he provided to Sinclair and had told Sinclair about the loan in December 1986. The court also held that Sinclair had not proved reasonable reliance because it was unreasonable "for Sinclair to rely only upon the corporate financial statements without considering the personal financial statements of the debtor who owned the corporation[s]."

The district court upheld the bankruptcy court's decision, holding that the court's factual findings were not clearly erroneous. Sinclair now appeals.

"We utilize the same standard of review as that of the district court." *Miller v. Farmers Home Admin. (In re Miller)*, 16 F.3d 240, 242 (8th Cir.1994). "We review the bankruptcy court's legal conclusions de novo and its factual findings under the clearly erroneous standard." *Id.* at 242–43.

■ Sinclair first argues that as a matter of law the bankruptcy court erred in concluding that the FNBSS debt was personal rather than corporate. We need not decide whether the debt was personal or corporate. Even if the bankruptcy court erred in characterizing the debt as personal, we agree with the court that the debt is dischargeable under section 523(a)(2)(B).

■ "Discharge is barred under § 523(a)(2)(B) only if, inter alia, the debtor acted with an 'intent to deceive.'" *Barclays*

*Am./Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 877 (8th Cir.1985). A bankruptcy court's finding concerning intent is a factual finding subject to the clearly erroneous rule. *Id.* Here, the bankruptcy court's finding that Jones did not act with an intent to deceive is not clearly erroneous. As the court noted, Jones did not hide the debt from Sinclair. Rather, he disclosed the debt on his personal financial statements which he forwarded to Sinclair at its request and reasonably assumed that Sinclair would review them along with the corporate statements.

 Because we uphold the bankruptcy court's no-intent-to-deceive finding, we need not address Sinclair's arguments concerning the court's no-reasonable-reliance finding, *see Valley Nat. Bank v. Bush (In re Bush)*, 696 F.2d 640, 644 n. 4 (8th Cir.1983) ("If an objecting creditor fails to prove every element contained in § 523(a)(2)(B) . . ., the debt is dischargeable."), but will do so. Sinclair argues that its reliance on the corporate statements was reasonable and that it had "no affirmative duty to verify the information . . . or otherwise investigate the statements." We disagree. "The reasonableness of a creditor's reliance, in our view, should be judged in light of the totality of the circumstances." *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993) (en banc). Among other things, a court may consider "whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Id.*

In the circumstances of this case, the bankruptcy court's finding that Sinclair's reliance on the corporate statements was unreasonable is not clearly erroneous. *See Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 341 (8th Cir.1987) (reasonableness of reliance subject to clearly erroneous review). First, as the bankruptcy court noted, because

Sinclair requested the financial statements of the companies' sole shareholder and guarantor, it was unreasonable for Sinclair to virtually ignore the statements in extending credit. Moreover, even Darrington admitted there were "red flags," including the past-due invoices in early 1991 and the returned drafts in September and November, that should have alerted Sinclair to investigate whether the companies' financial condition was as represented in the statements dated March 31.[3] *See First Am. Bank v. Schraw (In re Schraw)*, 136 B.R. 301, 304 (Bankr. S.D.Fla.1992) ("Where a [creditor] relies on a stale financial statement and never inquires as to whether the statement[ ] actually reflect[s] the debtor's current financial situation, the [creditor] fails to show reasonable reliance[;]" eight-month old statement was stale) (internal quotation omitted).

Accordingly, we affirm the judgment of the district court.

---

3. In addition to arguing that Sinclair's reliance was unreasonable, Jones argues that Sinclair did not in fact rely on the corporate financial statements in extending credit, especially after the returned draft on November 11. Jones notes that at this time Darrington was monitoring the accounts daily and asserts Sinclair only extended credit because of pressure from the marketing department. Although we are inclined to agree with Jones, we do not decide this issue.