In re Ted Carl RIGG and Tabatha Rigg, Debtors.

Community First Bank, Plaintiff,

v.

Ted Carl Rigg and Tabatha Rigg, Defendants.

Bankruptcy No. 3:03–BK–75919.
Adversary No. 3:03–AP–7201.

United States Bankruptcy Court,
W.D. Arkansas,
Harrison Division.

June 17, 2004.

James D. Sprott, Harrison, AR, attorney for Community First Bank.

Claude R. Jones, Harrison, AR, attorney for the debtors.

## OPINION

RICHARD TAYLOR, Bankruptcy Judge.

Berryville is not Denmark, but something is rotten there. Its origin is uncertain; neither the plaintiff or defendants eliminated themselves as suspects.

Community First Bank [Community Bank] located in Berryville, Arkansas, initiated two adversary proceedings. One sought to deny generally the debtors discharge under 11 U.S.C. § 727(a)(2)(B)and (a)(5). The other sought to determine the dischargeability of specific debts owed Community Bank under § 523(a)(2)(B). By agreement, the two adversary proceedings were tried together.

## JURISDICTION

This Court has jurisdiction over this matter under 28 U.S.C. § 1334 and 28 U.S.C. § 157, and it is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J). The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## BACKGROUND

The debtors, Ted and Tabatha Rigg, had a number of loans with Arvest Bank [Arvest] in Berryville. The debtors enjoyed a warm credit and personal relationship with Larry Easley [Easley], their account representative at Arvest. In 1998, Easley left banking to farm. In 2000, he was asked to start Community Bank, where he was its chief executive officer and president until he left in July 2002. Shortly after Easley started Community Bank, the debtors moved most, if not all, of their Arvest credit to Community Bank.

This relationship generated five pertinent promissory notes. (At least one other note, a home mortgage, exists, but was not part of this proceeding.) In historical order, they are as follows:

Note 1—dated March 16, 2000, renewed March 16, 2001, and March 16, 2002.

Note 2—dated March 22, 2000, not renewed.

Note 3—dated September 15, 2000, renewed September 15, 2001, and September 15, 2002.

Note 4—dated June 4, 2001, renewed June 4, 2002, and December 1, 2002.

Note 5—dated December 5, 2001. This is the most significant credit and is represented by a promissory note in the original principal amount of $130,000 collateralized principally by a commercial building and underwritten by the U.S. Small Business Administration [SBA Loan]. This note was not renewed.[1]

Interspersed with these five notes are three of the debtors' financial statements dated February 1, 2000; May 31, 2001; and September 13, 2002. The May 31, 2001, financial statement is on a standard SBA form [SBA Financial Statement]; the last financial statement, dated September 13, 2002 [Financial Statement], is the pivotal financial statement upon which Com-

---

1. The majority of the notes, originally and as renewed, were single pay notes. Although the record is not entirely clear on this point, it appears most of the notes were set up on monthly payments.

munity Bank relies in its assertion that the above five loans should not be discharged.

For the reasons stated below, the Court finds that the debtors are entitled to a chapter 7 discharge with the exception of the credit represented by Note 4, which the Court finds nondischargeable under 11 U.S.C. § 523(a)(2)(B).

## LAW

Under § 727(a), the debtors may be denied a discharge if—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be, transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.

11 U.S.C. § 727(a)(2), (5).

Under § 523(a)(2)(B), the debtors may be denied a discharge from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive

. . . .

11 U.S.C. § 523(a)(2)(B).

■ As discussed below, the reasonable reliance element that appears in § 523 is the only issue that troubles the Court. In that regard, the Eighth Circuit has adopted a totality of the circumstances test:

"The reasonableness of a creditor's reliance, in our view, should be judged in light of the totality of the circumstances." *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993) (en banc). Among other things, a court may consider "whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations." *Id.*

*Sinclair Oil Corp. v. Jones (In re Jones)*, 31 F.3d 659 (8th Cir.1994).

## THE FINANCIAL STATEMENTS

The two pertinent financial statements for a § 523 analysis are the May 31, 2001, SBA Financial Statement and the September 13, 2002, Financial Statement. The accuracy of the SBA Financial Statement was not seriously contested by Community Bank. In fact, it was used at trial by Community Bank as a benchmark to demonstrate and highlight the inaccuracies contained in the Financial Statement.

It is immediately clear to the Court that the Financial Statement, dated September 13, 2002, and supplied to Community Bank on September 20, 2002, satisfies three elements under § 523(a)(2)(B). Specifically, it is a statement in writing that is materially false, respecting the debtors' financial condition, and one the debtors caused to be

made or published with the intent to deceive.

In reaching the above conclusions, a comparison of the financial statements is helpful. The SBA Financial Statement lists the following principal assets:

| | |
|---|---|
| Cash on hand | $    300 |
| Savings account | $    100 |
| Accounts and notes receivable | $  24,000 |
| Real estate | $125,000 |
| Automobile | $  16,200 |
| Other personal property | $  49,700 |
| Other assets | $  12,600 |
| TOTAL | $227,900 |

Balanced against these assets are liabilities totaling $202,500, resulting in a net worth of $25,400. The debtors, in addition to an unquantified reference that Tabatha Rigg would "continue to work until the revenue from the business is sufficient" (SBA Financial Statement—Description of Other Income), reported an income stream of $1000 a month salary and $300 a month real estate income.

Two significant events occurred between the May 31, 2001, SBA Financial Statement and the September 13, 2002, Financial Statement. First, both Easley and Ted Rigg testified that the debtors' business began to experience significant difficulties in the summer of 2001. More specifically, the debtors principal business involved a great deal of buying and selling that necessitated access to the internet. In the summer of 2001, the county apparently cut a phone line that allowed the debtors access to the internet in the process of paving a nearby road. According to Easley and Mr. Rigg, this condition was never adequately rectified, even to the day of trial. Second, and perhaps an inevitable consequence of the first, the debtors fell behind in their loan payments

resulting in a number of conversations with Community Bank. These discussions culminated in a demand letter from Community Bank dated July 29, 2002. The five loans referenced in the demand letter were at least a month in arrears, with the SBA loan almost two months in arrears (53 days).[2]

Despite this setback and the resulting inability to meet debt service, the debtors financial condition apparently blossomed. The September 13, 2002, Financial Statement reflects an entirely different and more favorable financial situation:

| | |
|---|---|
| Cash value life insurance | $    5000 |
| Listed securities | $  14,450 |
| Vehicles | $  26,000 |
| Accounts/notes receivable | $  26,000 |
| Real estate | $250,000 |
| 1930 coupe and building | $  11,200 |
| 1992 and 1987 vehicles | $  12,300 |
| Personal property | $  16,000 |
| Guns | $    7800 |
| Lawn and garden | $    3000 |
| Shop equipment and tools | $    4800 |
| Business | $  40,000 |
| 1982 and 1967 Harleys | $  20,000 |
| TOTAL | $436,550 |

Balanced against these assets are liabilities totaling $336,302, resulting in a net worth of $100,248 (a four fold increase from the SBA Financial Statement of May 31, 2001). The debtors' reported income is reflected as $94,920.

The Financial Statement cannot withstand scrutiny. In fact, it is hardly defensible as an accurate document. First is the $94,920 statement of income. Apparently, the base amount of $72,000 is nothing more than a projection calculated by Easley[3] based on what he perceived would be the debtors' potential income over a one

---

2. There was one other note, a home loan, referenced in the demand letter. This note was reaffirmed by the debtors and not part of this § 523 proceeding.

3. As discussed later, Easely filled out the substantive portions of the Financial Statement and the debtors filled out the personal history portion.

year period from their internet business.[4] Added to that figure is a bonus or commission amount of $11,700 and real estate rental income of $11,220. These figures are not supported by the evidence and, especially with respect to the $72,000 salary figure, were incorrect when made. A review of the debtors' statement of financial affairs demonstrates a 2002 income of $6000 based on auctiontrader.com, $10,961 from Berryville Liquors, and an aggregate of $17,640 in rental income for the two years proceeding the debtors' September 5, 2003, bankruptcy filing.

As for the other assets, it is difficult to know where to start. Perhaps a mere sampling will suffice:

- The debtors offered no evidence that a $5000 cash value life insurance policy listed on the Financial Statement ever existed. In fact, according to Ted Rigg, the insurance policy had been canceled before the Financial Statement was given to Community Bank. The debtors could not even testify that there ever was a cash surrender value component to the policy.

- The two Harley–Davidson motorcycles listed were both in disrepair. One was in pieces in a basket left at a local repair shop.

- A 1995 Charger boat and motor simply were not found. The debtors asserted that the items were sold and the money paid to the Bank, but could offer no supporting or corroborating evidence.

- The debtors included a 1999 drop trailer on the Financial Statement. Apparently, the debtors do not own the trailer. It is owned by, and located with, an uncle.

- Other miscellaneous items listed on the Financial Statement were either not found or, when located, were sold for *de minimis* amounts. The debtors argued that many of these items were not pledged to Community Bank. This begs the question of whether their values were accurately stated on the Financial Statement. They simply were not.

- The debtors could not offer any explanation why the Financial Statement referenced $14,450 in "Listed Securities." This reference appears to be more related to vehicles, none of which appear to have a solid valuation foundation or basis.

- A 1930 coupe and two small buildings valued at $11,200 were apparently sold for approximately $3000. The vehicle was being restored.

- A 1994 Geo was let go by Community Bank for the $40 towing bill. The debtors had valued it at $3000 on the Financial Statement; Community Bank described its condition as "deplorable." A 1995 Blazer valued by the debtors at $9000 garnered $1650.

- The $40,000 business valuation appears to have been a made up figure with no supporting basis in the record.

If you remove the real estate and account receivable entries from the SBA Financial Statement, the remaining assets total $78,900. If you remove the real estate and account receivable entries from the Financial Statement, the remaining assets total $160,550, essentially for the same assets. The growth, resulting in a four-

---

4. The debtors apparently purchase and trade wholesale truckloads of Staples office supplies for resale. Ted Rigg testified that if he could have bought and sold supplies for 12 months, he would have made $72,000. However, he had only been able to buy and sell for 3 months before his phone line was cut.

fold increase in net worth, seems improbable when the debtors' business was failing and they were unable to make debt service.

In short, once sufficiently disputed by Community Bank, the debtors were unable to substantiate most of the value figures attached to various assets set forth in their Financial Statement. Perhaps the situation was exacerbated by the fact that, although the debtors signed and adopted the Financial Statement, Easley prepared the substantive portions. Suffice it to say that the Financial Statement is grossly inaccurate and rises to the level of fraudulent.

## 11 U.S.C. § 523

Community Bank contends that the defaults reflected in its July 29, 2002, demand letter resulted in the debtors generating the questionable September 13, 2002, Financial Statement, upon which Community Bank relied in forbearing collection and extending or renewing the above notes.

As stated above, it is clear that at least three elements of § 523 are satisfied. Accordingly, this Court's analysis should first focus on the predicate language found in § 523 requiring that the false financial statement was used to obtain money or "an extension, renewal, or refinancing of credit . . . ." To the extent that predicate condition is satisfied, then the Court's concluding analysis must address the reasonable reliance element extant in 523(a)(2)(B)(iii).

## PREDICATE CONDITION

■ Section 523 applies to an extension, renewal, or refinancing of credit. The language does not appear sufficiently expansive to cover a mere deferral of collection based upon the asserted false financial statement. Only one loan, Note No. 4, was actually renewed after the debtors supplied the Financial Statement to Community Bank on September 20, 2002. Further, the facts do not support Community Bank's contention that its post Financial Statement forbearance was reasonable or even based on the Financial Statement.

The Court's finding on the forbearance issue is adequately supported by comparing Exhibit Twelve, Community Bank's July 29, 2002, demand letter with Exhibit Nine, the payment history on each of the loans.[5] This analysis reflects the following:

**Note 1**—dated March 16, 2000, and renewed March 16, 2001, and March 16, 2002.

Note 1 was not renewed after the Financial Statement was supplied to Community Bank on September 20, 2002. This is a single pay note that would not mature until March 16, 2003. It is not referenced in the July 29, 2002, demand letter (although, there was some testimony that the Loan # 01 reference in the letter was in fact Note 1, which carries an # 02 designation). The evidence suggests that after the March 16, 2003, maturity date, a mere six months before the September 2003 bankruptcy filing, Community Bank did commence collection efforts. The payment history reflects that payment was not made in March 2003, so Community Bank was on notice at that time that it should proceed with all appropriate remedies.

**Note 2**—dated March 22, 2000.

Note 2 was never renewed. It is referenced in the July 29, 2002, demand letter as Loan # 04. This note involved

---

**5.** The Court observes that the note/loan numbers, as well as the collateral listed for each, do not always match up to, or can be reconciled with, the notes themselves; the July 29, 2002, demand letter; or the Exhibit Nine account histories.

rental property located in Missouri. The Exhibit Nine payment history reflects very erratic payments after July 29, 2002, and September 20, 2002, the date Community Bank received the Financial Statement. Accordingly, despite Community Bank's assertion that it relied on the Financial Statement, it was not receiving timely payments sufficient to adequately address debt service.

**Note 3**—dated September 15, 2000, and renewed September 15, 2001, and September 15, 2002.

This is a small, unsecured line of credit in the original amount of $2026.88. It was not included in the July 29, 2002, demand letter. This was also a single pay note that would mature on May 13, 2003. The last renewal was dated prior to Community Bank's receipt of the Financial Statement on September 20, 2002. The payment history reflects only two small payments (and maybe only one, split into principle and interest) after July 29, 2002, and nothing at the May 13, 2003, maturity date. Ms. Walker, the president of Community Bank, testified on behalf of Community Bank that no payments had ever been made against this note. Accordingly, there is no basis for Community Bank's contention that it deferred collection solely based upon the Financial Statement.

**Note 4**—dated June 4, 2001, and renewed June 4, 2002 and December 1, 2002.

This note is referenced in Community Bank's July 29, 2002, demand letter. Note 4 was renewed on December 1, 2002, after Community Bank received the Financial Statement on September 20, 2002. The payment history thereafter reflects one small payment of $188.27 applied against principal. At renewal, $740.83 was applied against interest. The past due interest amount of $1489.27 referred to in the July 29, 2002, demand letter does not appear to have been paid. Again, is difficult to see how the fraudulent Financial Statement caused Community Bank to defer collection when the debt itself was simply not being serviced. However, there does appear to be a foundation for concluding that the December 1, 2002, extension was based upon the Financial Statement.

**Note 5**—the SBA Loan, dated December 5, 2001.

Note 5 is referenced in the July 29, 2002, demand letter as 53 days past due. Once again, the payment history after that date does not support Community Bank's contention that it deferred collection based upon the Financial Statement. After July 2002, only two short payments, one posted August 14, 2002, the other posted April 23, 2003, were received from the debtors. Clearly, Community Bank, as early as August 2002, or even October 2002 right after it received the Financial Statement, was on notice that collection efforts should proceed immediately.

Note 4 is the only note that was renewed after Community Bank received the Financial Statement on September 20, 2002. Although Community Bank argues that it deferred collection on the notes based on the Financial Statement, the payment history on these notes does not support its argument. Nor does the code allow forbearance as a reason for the Court to determine the dischargeability of a debt. Accordingly, Note 4 is the only note upon which the Court can address the issue of reasonable reliance. Community Bank's complaint to determine the dischargeability of Notes 1, 2, 3, and 5 is denied and the debts represented by those notes are discharged.

## REASONABLE RELIANCE/LARRY EASLEY

■ The entire issue of reasonable reliance under § 523(a)(2)(B)(iii) is clouded by the ambiguous and somewhat questionable role played by Easley in the creation of the Financial Statement. In 1993, Easley started Arvest Bank in Berryville. In 1998, he left banking to farm, but was asked to start Community Bank in 2000. Easley was Community Bank's chief executive officer and president until July 2002, at which time he returned to farming. He had a lending relationship and a personal relationship with the debtors while at Arvest, which continued when he started Community Bank.

Easley left Community Bank in July 2002. On July 29, 2002, Community Bank sent its default letter to the debtors. It appears beyond question that, sometime after that date, Easley contacted Community Bank and asked for copy of the debtors old financial statement and a blank form financial statement. Community Bank had also supplied the debtors with a blank form financial statement. Easley filled out the substantive portions of the Financial Statement. The debtors filled out the personal history portion, executed the Financial Statement, and delivered it to Community Bank. Easley's testimony is very gray in this area as to how he arrived at the figures and the extent of his due diligence with respect to values and the existence of the listed assets. In fact, despite his excellent memory about minute aspects of his relationship with the debtors, he seems to have little recollection of the Financial Statement and his participation.

Cindy Epley, vice president of Community Bank, testified on behalf of Community Bank that she received the Financial Statement on September 20, 2002, and, based upon the information contained therein, she did not pursue collection and renewed several of the loans. Despite Ms. Epley's testimony, only one note was actually renewed after September 20, 2002; Note 4 was renewed on December 1, 2002.

Community Bank cannot demonstrate that it reasonably relied on the Financial Statement with respect to the issue of forbearance. First, in July 2002, the debtors were already in substantial default on their loans. Second, the Financial Statement is nearly bogus on its face. Had anyone at Community Bank critically scrutinized the document, or compared it with the debtors' previous financial statements, its obvious deficiencies would have been immediately evident. Third, the debtors had an extremely poor payment history which, as an analysis of Exhibit Nine demonstrates, worsened significantly immediately after receipt of the September 2002 Financial Statement.

These factors would seem to negate a finding that Community Bank reasonably relied on the Financial Statement in renewing Note 4. However, the Eighth Circuit's "totality of the circumstances" test permits this conclusion for several reasons. First, Community Bank asked for a new financial statement at a time when the debtors' loans were in default and were being reviewed. Second, Easley, the past president and account officer most intimately familiar with the debtors' financial condition, prepared the substantive part of the Financial Statement. This was known to Community Bank at the time and it should have been in a position to rely on Easley's participation in the process. Third, the debtors offered no testimony that Community Bank's reliance was unreasonable under the circumstances. In fact, the debtors argued that the Financial Statement was accurate and, thus, implied that Community Bank's reliance was reasonable. This is especially so in the case

where the projected income figure would have adequately addressed debt service. For these reasons, the Court finds that all elements of § 523(a)(2)(B) are met with respect to Note 4 and the debtors' debt relating to Note 4 is nondischargeable.

Easley's participation in preparing a false financial statement raises serious questions as to the real purpose and use of the Financial Statement. It appears that Community Bank had an SBA guaranteed loan where the initial $125,000 appraisal was done by an appraiser who subsequently lost his license, is no longer used by Community Bank, and, while doing his appraisal, missed the fact that the property did not have water utility access. Community Bank subsequently obtained a valid appraisal that reflects a serious reduction in collateral value. Easley was the president of Community Bank and the debtors' loan officer. He left Community Bank in July 2002. By the end of that same month, Community Bank made demand on the debtors based on substantial defaults. Easley then assisted the debtors in preparing a false and fraudulent financial statement. The debtors adopted the false financial statement, signed it, and published it to Community Bank. Community Bank then extended only one note. The debtors' poor payment history did not correct itself. In fact, it immediately grew worse. Community Bank was on notice to proceed with collection immediately.

The facially false financial statement appears to have served little or no purpose other than perhaps documenting a file. Denmark indeed.

## CONCLUSION

The debtors were in the best position to fully appreciate and know the falsity of the Financial Statement. With the obvious intent to deceive, they published it to Community Bank, knowing it was false. The unrebutted testimony and record reflect that Note 4 was thereafter extended on the basis of the Financial Statement.

Accordingly, the Court determines that the predicate requirements and all four elements set forth in 11 U.S.C. § 523(a)(2)(B) are met with respect to Note 4 and the debtors' debt relating to Note 4 is nondischargeable. Because the predicate requirement of "extension, renewal, or refinancing" is not met in relation to Notes 1, 2, 3, and 5, the indebtedness relating to those notes are discharged.

■ Community Bank's complaint respecting discharge under 11 U.S.C. § 727(a)(2) and (a)(5) is denied. The debtors satisfactorily explained the disposition of their assets in the year prior to bankruptcy. The assets were just not worth much. It would be incongruous for Community Bank to assert the false values in the Financial Statement as a basis for their § 523 claim, then hold the debtors to a standard of proving why they did not realize those values for purposes of examining their disposition under § 727.

## REFERRAL

A copy of this opinion will be forwarded to the United States Trustee for referral to the office of the United States Attorney for investigation.

IT IS SO ORDERED.