In re David M. and Glinda N. OWENS, Debtors.

First National Bank of Stuttgart, Arkansas, Plaintiff,

v.

David M. and Glinda N. Owens, Defendants.

Bankruptcy No. No. 2:03–BK–17378M. Adversary No. 2:04–AP–1171.

United States Bankruptcy Court, E.D. Arkansas, Helena Division.

March 7, 2005.

Edward H. Schieffler, Schieffler Law Firm, West Helena, AR, for Debtors.

### MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

On June 20, 2003, David and Glinda Owens ("Debtors") filed a voluntary petition for relief under the provisions of Chapter 7. On April 26, 2004, First National Bank of Stuttgart, Arkansas ("Bank") filed a complaint to determine the dischargeability of a debt in the sum of $1,499,203.10 owed to the Bank by Owens Planting Company ("Partnership"), a partnership consisting of four individuals, including the Debtors. Both of the Debtors guaranteed the debts of the Partnership to the Bank.

The complaint alleges that the debt to the Bank should be determined to be non-dischargeable because the Debtors, on behalf of the Partnership, submitted a false financial statement in writing upon which the Bank reasonably relied in violation of 11 U.S.C. § 523(a)(2).

Trial on the merits was held in Helena, Arkansas, on October 4, 2004, and the matter was taken under advisement. The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I)(2000), and the Court may enter a final judgment in this case. The following shall constitute findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

### FACTS

The facts are not substantially in dispute. The Debtors are married and reside in Clarendon in Monroe County, Arkansas. They were general partners in the Partnership, which was engaged in the farming and trucking business. The Partnership leased and farmed a total of 6913 acres and produced rice, soybeans, wheat, and corn. The Debtor, Mr. Owens, acknowledged that he managed the Partnership's business affairs and that he also worked on the farm, driving tractors, running combines and performing similar tasks. Mrs. Owens taught preschool.

Waylon Wiggins ("Wiggins"), executive vice president of the Bank, handled the loan to the Debtors that is the subject of this complaint. Wiggins is a loan officer with 25 years of experience in agricultural lending. He previously worked for Production Credit Association for about eight years and for BancorpSouth[1] for about 15 years before taking a position with the Bank, where he has been employed for approximately two years.

When he was employed by BancorpSouth or its predecessors, Wiggins facilitated loans to the Partnership over the course of approximately ten years. In 2002, the Bank hired Wiggins as Executive Vice President. Wiggins acknowledged that he actively and successfully solicited the Debtor's business for the year 2003 on behalf of his current employer.

The financial statement that is the subject of this complaint was completed by the

---

1. According to Wiggins' testimony, First Stuttgart Bank and Trust became First United Bank, which was subsequently acquired by BancorpSouth.

Debtor, Mr. Owens, with the assistance of Wiggins. (See Pl.'s Ex. 1.) The Bank required the completed statement, termed an "Agriculture Balance Sheet," in order to extend the crop production loan for 2003 and two other loans for the Partnership's grain bins and farming equipment.

The statement purported to show the financial condition of the Partnership as of November 6, 2002.[2] The statement reflected current assets consisting of cash; accounts receivable; hedging account equity; products on hand, such as seed and unsold commodities consisting of rice, soybeans and corn; and 1052 acres of growing wheat. The Debtor valued the liquid assets at $1,539,764.00.

As to liabilities, the Debtor indicated a debt to BancorpSouth of $792,480.00, which was the unpaid balance of the 2002 crop production loan and some other liabilities unrelated to this litigation. The Debtor did not list any 2002 crop production liabilities other than the debt to BancorpSouth. All liabilities listed totaled $1,549,742.00. The total assets of the Partnership were valued at $2,736,414.00, which, when compared to the liabilities listed, indicated a net worth of $1,186,672.00.

Wiggins testified for the Bank. He stated that as part of the loan agreement, he required the updated financial statement identified as Plaintiff's Exhibit 1. He stated that he did not remember discussing with the Debtor that it was unnecessary to disclose certain existing debts on the financial statement. (Tr. at 62.) On direct examination, Wiggins testified as follows:

MR. BERRY: Q. [You heard Owens' testimony] That over the years, y'all had developed a relationship so that it was not necessary for him to disclose certain indebtedness to you?

MR. WIGGINS: A. I don't remember those conversations.

MR. BERRY: Q. Well, let's go over— each year, these financial statements would be reviewed with Mr. Owens; would they not?

MR. WIGGINS: A. Yes, sir.

MR. BERRY: Q. The same format we're talking about that was used in 2002?

MR. WIGGINS: A. Yes, sir.

MR. BERRY: Q. Did you make him aware of the significance of these financial statements that were being provided to you?

MR. WIGGINS: A. Throughout the years, yes, sir.

MR. BERRY: Q. And how would you do that?

MR. WIGGINS: A. Well, we would go over his financial position and compare it to the prior year.

MR. BERRY: Q. Was any mention made of him not being required to disclose certain indebtedness?

MR. WIGGINS: A. No, sir.

MR. BERRY: Q. Specifically, Mr. Owens owed how much outside indebtedness in November of 2002, to your recollection?

MR. WIGGINS: A. $650,000.

. . .

MR. BERRY: Q. Was there any discussion between you and Mr. Owens with regard to this outside indebtedness?

MR. WIGGINS: A. No, sir.

MR. BERRY: Q. Did you go over his financial statement?

MR. WIGGINS: A. Yes, sir.

MR. BERRY: Q. Did you go over it in more detail in November of 2002 than you normally would have?

2. Typically, all of the crops grown in 2002 would have been harvested by November.

MR. WIGGINS: A. I don't think I went over the financial statement in more detail, no sir.

MR. BERRY: Q. What kind of experience had you had with him up to this point in time, Mr. Wiggins?

MR. WIGGINS: A. I'd had very good experience with him in the past, up to this point.

MR. BERRY: Q. He had always provided you the financial information that was requested?

MR. WIGGINS: A. Yes, sir.

MR. BERRY: Q. Had it always been truthful, as far you knew?

MR. WIGGINS: A. As far as I know it had, yes, sir.

MR. BERRY: Q. Had you developed a trust in the information he was providing you?

MR. WIGGINS: A. Yes, sir, I had.

(Tr. at 62–63.)

After the loan was made, the Debtor made payments on many outstanding debts incurred in the production of the 2002 crop from the proceeds of the 2003 crop production loan. These included the following:

| CHECK NO. | DATE | PAYEE | AMOUNT | |
|---|---|---|---|---|
| 1001 | 11/25/02 | PHI | $201,052.40 | |
| 1003 | 11/28/02 | Pauline Everett | $ 4,000.00 | Rent |
| 1012 | 12/11/02 | Jeff Calloway, Inc. | $ 16,431.13 | Fuel |
| 1032 | 1/08/03 | BancorpSouth | $200,000.00 | |
| 1025 | 1/03/03 | Raymond R. Abramson | $ 15,395.60 | Rent |
| 1026 | 1/03/03 | Raymond R. Abramson | $ 17,123.50 | Rent |
| 1031 | 1/06/03 | FCC Equipment | $ 712.99 | |
| 1035 | 1/16/03 | Pride Family Partnership | $ 28,000.00 | Rent |
| 1070 | 2/19/03 | BancorpSouth | $190,000.00 | 2002 operating loan |
| 1094 | 3/07/03 | BancorpSouth | $100,000.00 | 2002 operating loan |

(Pl.'s Ex. 12.) The Partnership also paid employees in November and December 2002 from the 2003 production loan extended by the Bank.

Wiggins testified that he first learned that the loan was in trouble in May 2003 when Mrs. Owens contacted the Bank to advise that Mr. Owens was suffering from depression and was not able to make business decisions. Wiggins learned that some crops had not yet been planted and that the partnership did not have sufficient funds remaining from the 2003 operating loan to complete production on the farmland that had been leased.

Wiggins stated that the Debtor's condition improved over the next ten days and he held a series of meetings with the Debtor to determine "where we were then, what bills were owed, what it was going to take to get the crop out, and to start looking at projections and seeing what the next step was." (Tr. at 66.)

During the course of the meetings, Wiggins instructed the Debtor to complete a

revised financial statement reflecting the partnership's liabilities and assets as of November 15, 2002. This statement was introduced as Plaintiff's Exhibit 9. The revised financial statement contained several substantial liabilities not reported on the original financial statement. These included the following:

| | | |
|---|---|---|
| 1. | Helena Chemical | $244,000.00 |
| 2. | PHI Wheat | $200,000.00 |
| 3. | CCC (Rice) | $ 57,394.00 |
| 4. | CCC (Corn) | $239,261.00 |
| | TOTAL: | $740,655.00 |

Wiggins explained the program operated by Commodity Credit Corporation ("CCC"). He stated that farmers typically use crops as collateral for a government-backed, low-interest loan from the CCC. Farmers use the proceeds to pay down the existing crop production loan at a commercial bank. A CCC crop loan secured by crops already encumbered by an existing production loan is only available to a farmer if the existing commercial lender agrees to subordinate its security interest to CCC's subsequent security interest.

The revised financial statement had only minor adjustments in assets and demonstrated an adjusted net worth of $407,668.00 rather than $1,186,672.00 as reported on the original financial statement. The Debtor testified that the original financial statement was filled out the way it had been in past years and that Wiggins knew of the omitted 2002 crop expenses but agreed that it was unnecessary to reflect the debts on the statement. Owens' statement directly contradicted Wiggins' testimony on direct examination that he never indicated to the Debtor that he did not have to show obligations to suppliers.

Mr. Owens testified that he had omitted other assets from the November 2002 financial statements including receivables from truck operations in the sum of $36,767.00, government payments totaling $281,298.00 and Riceland base capital valued at $32,195.00, which, when compared to the revised liabilities, added up to a net worth of $862,890.00 (Def.'s Ex. 15.)

There is considerable evidence to suggest that the Bank was aware of the omitted liabilities. Wiggins obtained a lien search from the Circuit Clerk of Monroe County, Arkansas, which reflected liens filed by the CCC, dated November 5, 2002, encumbering the 2002 rice crop and another lien filed by the CCC on August 12, 2002, encumbering the 2002 corn crop. (Def.'s Ex. 1.)

The Debtor also introduced a lien search Wiggins had ordered the previous year when he worked for BancorpSouth that reflected nine separate filings by the CCC. (Def.'s Ex. 2.) The Debtor introduced the financial statements prepared by the Debtor and submitted to Wiggins as the loan officer for BancorpSouth or First United Bank dated December 20, 2001; December 1, 2000; November 16, 1999; November 19, 1998, and November 18, 1997. None of these financial statements listed any liability to CCC or liabilities for farm supplies except the statement dated November 16, 1999, which listed an outstanding CCC loan secured by the rice crop of $124,800.00.

On direct examination, Wiggins specifically stated that he never advised the Debtor he did not have to list crop production liabilities. He stated the following:

MR. BERRY: Q. You have heard Mr. Owens' testimony with regard to that?

MR. WIGGINS: A. Yes, sir. (Tr. at 61.)

MR. BERRY: Q. That over the years, y'all had developed a relationship so that it was not necessary for him to disclose certain indebtedness to you?

MR. WIGGINS: A. I don't remember those conversations.

(Tr. at 61–62.)

MR. BERRY: Q. Was any mention made of him not being required to disclose certain indebtedness?

MR. WIGGINS: A. No, sir.

(Tr. at 62.)

MR. BERRY: Q. Was there any discussion between you and Mr. Owens with regard to this outside indebtedness?

MR. WIGGINS: A. No, Sir.

(Tr. at 63.)

MR. BERRY: Q. Now, during the period of time that you've been working with Mr. Owens, did you ever indicate to him that he would not need to show any obligations he owed to suppliers that were not currently being paid?

MR. WIGGINS: A. No, sir.

(Tr. at 70–71.)

Wiggins stated on cross examination that he did not remember seeing the lien in favor of CCC that appeared on the lien search he ordered in late 2002. He acknowledged that he did not contact CCC to inquire as to the amount owed to CCC. When asked about the lien search he ordered the previous year when he worked at BancorpSouth, Wiggins testified that the fact that the liens shown on the lien search did not appear on the financial statement did not send up a red flag. (Tr. at 83.)

Thereafter he admitted that when he worked for BancorpSouth he was the person who agreed to subordinate Bancorp-South's security interest to the indebtedness owed to the CCC secured by the 2002 crop. Wiggins stated the following:

THE COURT: Q. So you were aware that there were CCC loans that weren't reported on the financial statements?

MR. WIGGINS: A. I'd have to release those and subordinate them back. So the answer to that is yes, sir.

THE COURT: Q. So his testimony about you-all routinely not putting those CCC loans on the financial statements is true; isn't it?

MR. WIGGINS: A. Well—

THE COURT: Q. Since you were the one that was releasing and subordinating them, you knew about them?

MR. WIGGINS: A. Yes, Sir, I knew they were there up front. It's up to the farmer to sell that grain at any point in time and bring those proceeds back in.

THE COURT: Q. So his testimony is true that you knew y'all weren't putting those on there?

MR. WIGGINS: A. Yes, Sir, to a certain extent.

THE COURT: Q. Well, to the extent of the CCC loans?

MR. WIGGINS: A. To the CCC loans, right.

THE COURT: Q. Is his testimony not true, though, as to the other creditors who would have been supplying him seed and fertilizer, that you-all would have sort of agreed just to leave those off; that testimony is false?

MR. WIGGINS: A. No, Sir. My testimony is that year in and year out, he paid his bills or even prepaid bills at the end of the year. He paid ahead in order to get a tax benefit out of those at year end.

THE COURT: Q. Did he tell you he did that or did you assume he did?

MR. WIGGINS: A. He told me.

THE COURT: Q. But you never discussed with him any

MR. WIGGINS: A. ... outstanding production expenses other than the CCC that wouldn't be reflected on the financial statements?

MR. WIGGINS: A. That's right.

THE COURT: Q. So on this 2002 financial statement, you pretty much knew that there was an outstanding CCC balance in some amount; didn't you?

MR. WIGGINS: A. I did not even think about the CCC loans.

THE COURT: Q. All right. So it would be correct that had you thought of it, there would have been the possibility of a $400,000 or $500,000 CCC loan outstanding at the time you did this financial statement?

MR. WIGGINS: A. There would be around a $250,000 CCC loan at that point, which still wouldn't have thrown the operation into a negative cash flow for 2002.

THE COURT: Q. That's the big problem; isn't it?

MR. WIGGINS: A. In looking at any of these, even the CCC loan would not throw any of these years into a negative cash flow position for that particular year.

THE COURT: Q. As a banker, why in the world would you agree to do a financial statement and leave off a significant liability like the CCC in those other years?

MR. WIGGINS: A. I would not intentionally.

THE COURT: Q. Well, you've already said you knew of the existence of the loans year in and year out.

MR. WIGGINS: A. Well, my answer—I tried to answer that it was my responsibility to release that. So I knew at some point, which would have been like two or three months prior to this; but at the time that he came in, I obviously forgot about those.

THE COURT: Q. But you did that several years in a row, didn't you?

MR. WIGGINS: A. Or we would have netted them out on the other side, the inventory side, one or the other, but I don't know what we did with them.

THE COURT: Q. But didn't you do that several years in a row in previous years?

MR. WIGGINS: A. It looks like two or three years, yes, Sir.

THE COURT: Q. So you knew that CCC liabilities were not showing up on these annual financial statements. As a banker, why would you do that?

MR. WIGGINS: A. I can't tell you that I did it intentionally. As a banker, I wouldn't have done that intentionally.

THE COURT: Q. So was this an oversight?

MR. WIGGINS: A. Yes, Sir.

(Tr. at 107–110.)

Wiggins also testified that a crop production loan is intended to cover the expense of putting in the current crop, but there are no written or oral restrictions on the borrower that prohibit him from using the money to pay existing production expenses resulting from the previous year's crop or some other indebtedness such as rent. Wiggins testified that the Bank ceased advancing money on the 2003 crop loan with $90,000.00 left to draw and had a receiver appointed to finish out the crop.

Owens stated that in his several years of dealing with Wiggins that by agreement they did not include outstanding crop production expense debts on the financial statement even though Wiggins was aware of the indebtedness (Tr. at 19.) In response to the Court's questions, Owens answered as follows:

THE COURT: Q. What's the purpose of filling out a financial statement that doesn't list all the liabilities?

MR. OWENS: A. There were certain assets and liabilities that we didn't traditionally list.

THE COURT: Q. Well, that's not my question. What's the purpose of—I mean, you're obviously a very intelligent man and understand finances. Why would you fill out a sheet like this and leave off liabilities and leave off assets?

MR. OWENS: A. I guess we just had a grouping of things that we normally put on there. We'd been doing it that way for eight to ten years; and when it came time to do it again, we did it the same way, your Honor. Typically, it did not include CCC loans or outstanding debts; but there are some others—and Mr. Schieffler will get into those loans—that were on the asset side that we typically did not include.

THE COURT: Q. Were these CCC loans in significant amounts?

MR. OWENS: A. There was a $197,000 loan for corn and a $56,000 or $57,000 [loan] for rice.

THE COURT: Q. Were they secured by the crops?

MR. WIGGINS: A. Yes, Sir.

THE COURT: Q. Were they behind BancorpSouth?

MR. OWENS: A. BancorpSouth gave CCC a waiver for those.

THE COURT: Q. Did you divert any of BancorpSouth's collateral without their permission?

MR. OWENS: A. No. They released everything.

. . .

THE COURT: Q. Okay. When you say that was the way "we" always filled out the financial statement, who is we?

MR. OWENS: A. Well, I filled the financial statement out. I say we because there are four partners in the partnership. Mr. Wiggins and I had done this 10 or 15 times over the last 10 or 15 years, and we just kinda got into a scenario of this is what we include and we ignore these other things; and that's the way we filled it out.

THE COURT: Q. So while he was working for the bank, Mr. Wiggins agreed that a financial statement could be presented which did not contain all the liabilities?

MR. OWENS: A. Yes, Sir. It was kind of a mutual understanding. We never included any outstanding production expense liabilities that we had.

THE COURT: Q. Did he specifically agree to that; I mean, did you discuss it with him? Let's say on this particular one, Plaintiff's Exhibit 1, did you discuss with Mr. Wiggins that it didn't contain all the liabilities?

MR. OWENS: A. We did not specifically discuss it that year.

THE COURT: Q. You'd discussed it in previous years?

MR. OWENS: A. Yes, sir.

THE COURT: Q. And what did he say?

MR. OWENS: A. I don't recall the exact conversation, but basically—and I think when you see the adjusted financial statement that reflects all those, you'll see that we did not have a negative worth by any means.

THE COURT: Q. That's not my question. What did he say; did the banker say words to the effect that you didn't have to put those several hundred thousand dollars in liabilities?

MR. OWENS: A. Well, I wouldn't say it was several hundred thousand dollars every year.

THE COURT: Q. Well, you tell me then. When he talked about it, what did he say?

MR. OWENS: A. Well, if we talked about it and he said it was not necessary to put those, we didn't put those.

THE COURT: Q. That it wasn't necessary to put liabilities owed to individual creditors for crop production expenses as opposed to the bank?

MR. OWENS: A. That's correct.

THE COURT: Q. All right. Did he say why?

MR. OWENS: A. Well, I think the financials always indicated that we were—whether it was $1.1 million in this case of $900,000 really didn't make any difference in terms of whether they made the loan or not. That was my assumption, that the net worth was significant enough and our production history was consistent enough that he felt like it was a good loan.

(Tr. at 42–47.)

## DISCUSSION

With regard to false financial statements, the Bankruptcy Code specifically provides

a) a discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . .

2) for money ... to the extent obtained by—

. . .

B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's ... financial condition;

(iii) on which the creditor to whom the debtor is liable for such money ... reasonably relied; and

(iv) that the debtor caused to be made or published with the intent to deceive.

11 U.S.C. § 523(a)(2)(B) (2000).

 The plaintiff must establish the following factors:

(1) the existence of a statement in writing;

(2) the writing is materially false;

(3) the writing concerns the debtor's financial condition;

(4) the creditor reasonably relied on the statement; and

(5) the statement was made with intent to deceive.

*First Nat'l Bank v. Pontow,* 111 F.3d 604, 608 (8th Cir.1997); 4 Collier on Bankruptcy ¶ 523.08[2] (Alan N. Resnick & Henry J. Sommer, *et al.* eds., 15th ed. rev.1993). Each of the elements must be proved by a preponderance of the evidence. *Pontow,* 111 F.3d at 608 (citing *Grogan v. Garner,* 498 U.S. 279, 286–87, 111 S.Ct. 654, 112

L.Ed.2d 755 (1991); *Valley Nat'l Bank v. Bush (In re Bush)*, 696 F.2d 640, 644 n. 4 (8th Cir.1983)).

In this case, the facts are not in dispute that the Agriculture Balance Sheet is a statement in writing that is materially false and that it concerns the Debtor's financial condition. What is in dispute is whether the creditor reasonably relied on the statement and whether the statement was made with the intent to deceive.

■■■ Under the statute, the Bank must show that not only did the creditor rely on the false statement in writing but that the reliance was reasonable. Reasonableness is judged in light of the totality of the circumstances. *Sinclair Oil Corp. v. Jones (In re Jones)*, 31 F.3d 659, 662 (8th Cir.1994) (quoting *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d 257, 261 (5th Cir.1993) (*en banc*)). In judging reasonableness, courts should consider " 'whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.' " *Jones*, 31 F.3d at 662 (quoting *Coston*, 991 F.2d at 261).

■■■ The Bank has not established by a preponderance of the evidence that it actually or reasonably relied on the Debtor's 2002 financial statement. On direct examination, Wiggins repeatedly stated that he was unaware of any agreement with regard to the omission of certain indebtedness from the financial statement. Upon further examination, he admitted that he had knowledge of the CCC indebtedness when it was pointed out that he was the officer for BancorpSouth who had previously subordinated BancorpSouth's lien to the CCC's lien position.

Further, the evidence demonstrated that lien searches initiated by him documented the CCC's security interest in the Partnership's crops, even though the indebtedness was omitted from the financial statement. In support of the Debtor's testimony, the Partnership's financial statements submitted to Wiggins in previous years established a pattern that the CCC obligation not be included as a liability. Clearly, Wiggins knew of the existing but undisclosed CCC indebtedness; therefore, he did not actually rely on the financial statement as to these obligations.

Even if Wiggins had relied on the complete accuracy of the financial statement, the reliance was not reasonable because the lien search in late 2002 served as a red flag alerting him to undisclosed liabilities. By his own admission, Wiggins did not investigate the extent of the indebtedness to CCC although an ordinarily prudent lender without knowledge of the obligation would certainly have done so.

The testimony of Wiggins and the Debtor conflicted as to whether unpaid crop expenses from 2002 were also, by tacit agreement, omitted from the financial statement. The court credits the Debtor's testimony over that of Wiggins. The documentary evidence demonstrates that Wiggins did not testify truthfully, or at the very least was evasive, with regard to the CCC debts. His lack of candor with regard to the CCC debts undermines his credibility as to the omission of unpaid crop expenses.

■■■ Furthermore, because the Court draws the inference that Wiggins was aware of the unpaid crop expenses and other undisclosed liabilities, the Court also infers that the Debtor and Wiggins had agreed at some point in the relationship that these liabilities need not be listed on the yearly financial statement. Therefore,

422

there is insufficient evidence of intent to deceive on the part of the Debtor.

For these reasons, the plaintiff's complaint is dismissed, and the debt to plaintiff is determined to be dischargeable.[3]

IT IS SO ORDERED.

---

**3.** The Bank never introduced any evidence that Mrs. Owens had any participation in the preparation of the financial statement.